United States District Court
Southern District of Texas
**ENTERED**
February 19, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHARLES ANTHONY CUEVA II, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-417 |
| | § | |
| WILLIAM  STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION

Petitioner is an inmate in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID") and is currently incarcerated at the McConnell Unit in Beeville, TX.  Petitioner filed this petition pursuant to 28 U.S.C. § 2254 on October 8, 2014. (D.E. 1).   The subject of the petition is a 2009 Nueces County conviction for aggravated sexual assault of a child and indecency with a child.   Petitioner alleges he received ineffective assistance of counsel.  (D.E. 1).

On May 7, 2014, Respondent filed a Motion for Summary Judgment.  (D.E. 8). Petitioner filed a response on July 8, 2015.  (D.E. 13).[1]  As discussed more fully below, it is recommended that Respondent's Motion for Summary Judgment be **GRANTED** and

---

[1]While the undersigned has considered both parties pleadings in their entirety, counsel for both Petitioner and Respondent are cautioned that any future pleadings in any case filed before this Court should comply with the applicable rules regarding page limitations unless leave of Court is first granted.

Petitioner's action for habeas corpus relief be **DISMISSED**.  It is further recommended a Certificate of Appealability be **DENIED**.

## I.   JURISDICTION

Jurisdiction and venue are proper in this Court because Petitioner was convicted in Nueces County, Texas, which is within the Corpus Christi Division of the Southern District of Texas.  28 U.S.C. § 2241(d); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000); 28 U.S.C. § 124(b)(6).  Further, Petitioner is incarcerated at the McConnell Unit in Bee County, Texas, which is also within the Corpus Christi Division of the Southern District of Texas.  *Id*.

## II.   BACKGROUND

On March 9, 2009, Petitioner, after a jury trial, was found guilty of two counts of aggravated sexual assault of a child and one count of indecency with a child and sentenced to seventy years for each count of aggravated sexual assault and fifteen years for indecency with a child, sentences to run concurrently.  (D.E. 6-17, Pages 1-2).[2] Petitioner, after obtaining his present counsel, then filed a motion for a new trial which, after a hearing, was denied by the trial court on May 26, 2009.  (D.E. 6-3; D.E. 6-4; D.E. 6-5; D.E. 6-9, Pages 57-72; and D.E. 6-10, Page 45).  Petitioner filed a direct appeal and the Thirteenth District Court of Appeals affirmed his conviction on May 2, 2011. (D.E. 5-7 and D.E. 5-17, Pages 34-71 and D.E. 5-18).  Petitioner filed a petition for discretionary review ("PDR") on July 27, 2011, with the Texas Court of Criminal Appeals ("CCA")

---

[2]Petitioner's trial counsel was Eric Perkins ("Perkins") and the presiding judge was the Honorable Nelva Gonzales Ramos.  (D.E. 1, Page 2 and D.E. 6-17, Page 2).

maintaining, among other arguments, that there was ineffective assistance of trial counsel.  (D.E. 5-17, Pages 1-33).  On September 14, 2011, this petition was refused and on December 14, 2011, Petitioner's request for rehearing was denied.  (D.E. 5-12, Page 1 and D.E. 5-13).

On March 11, 2013, Petitioner filed an application for state habeas corpus relief in which he argued there was ineffective assistance of trial counsel.  (D.E. 6-25, Pages 5-19).  On October 8, 2014, Petitioner's application was denied without written order by the CCA.  (D.E. 6-12, Page 1).  The same day, Petitioner filed the pending petition, alleging ineffective assistance of trial counsel.  (D.E. 1).[3]

## III.   APPLICABLE LAW

### A.   Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56.  Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show

---

[3]This action is timely filed.  The one year limitation period set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA") begins to run on "the date on which the judgment becomes final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1).  Conclusion of direct review occurs 90 days after the final state court ruling.  *Jimenez v. Quarterman*, 555 U.S. 113, 117-119 (2009).  In this case, Petitioner's request for rehearing on his PDR was denied on December 14, 2011 and the direct review period concluded on March 13, 2012.  Therefore, the one year statute of limitations period pursuant to AEDPA to file the present action concluded on March 13, 2013.  However, Petitioner filed his state habeas petition on March 11, 2013, thereby tolling the limitations period two days before its expiration.  28 U.S.C. § 2244(d)(2).  Petitioner filed the pending action the same day his state habeas action was denied.  (D.E. 1).

with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.,* 232 F.3d 473, 477 (5th Cir. 2000).

Rule 56 of the Federal Rules of Civil Procedure generally applies to federal habeas corpus cases. *Clark v. Johnson*, 202 F.3d 760, 764-65 (5th Cir. 2000)(citations omitted)); *see also* Fed. R. Civ. P. 81(a)(4) ("These rules apply to proceedings for habeas corpus...."). While summary judgment rules apply with equal force in a § 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, such findings must be accepted as correct by the federal habeas court. *See Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke,* 542 U.S. 274, (2004).

### B.    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") 28 U.S.C. §2254

Federal habeas relief is available to a state prisoner only if he is being held in violation of the Constitution, laws, or treaties of the United States. *Boyd v. Scott*, 45 F.3d 876, 881 (5th Cir. 1994) (per curiam) (citation omitted). Under AEDPA, a state prisoner may not obtain relief with respect to any claim adjudicated on the merits in state court proceedings unless the adjudication of the claim:

(a) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(b) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the principle to the facts of the prisoner's case.  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Although "unreasonable" is difficult to define, the Court noted it is an objective, rather than subjective, standard and emphasized there is a critical difference between an unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law.  *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001)(*citing Williams*, U.S. 362 at 412-413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(*quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  A federal habeas court must determine what theories or arguments supported, or could have supported, that state court's decision.

Then it must ask whether it is possible that fair minded jurists could disagree that the arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *Harrington*, 562 U.S. at 101. Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

The standard is very difficult to meet. "As amended by AEDPA, § 2254(d) stops short of the imposing a complete bar on federal court litigation of claims already rejected in state proceedings…It preserves authority to issue the writ in cases where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Id*. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Id*. at 101-103. In addition, if a decision by a state court is silent as to the reasons for the refusal, a federal habeas court can "look through" the decision and evaluate the last reasoned state court decision. *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999).

A state court's factual findings are presumed to be correct and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006). This deference extends not only to express findings of fact, but to the implicit findings of the state court. *Id*. In addition, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the

state court to deny relief." *Harrington*, 562 U.S. at 98.  "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *Id*. at 100.

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's ineffective assistance of counsel claims are all grounded on incidences of his trial counsel's alleged failure to investigate and to object to certain testimony, arguments and evidence.  For the reasons that follow, the undersigned recommends  that Petitioner has failed to demonstrate the state court unreasonably denied his ineffective assistance of counsel claims.  Therefore, it is recommended Petitioner is not entitled to relief and Respondent is entitled to summary judgment.

### A.   Standard

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal.  To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-prong test set out in *Strickland v. Washington*.  466 U.S. 668 (1984).  Petitioner must show counsel's performance fell below an objective standard of reasonableness and that deficient performance prejudiced the defense.  To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at 687-88.   Petitioner must prove he was prejudiced by his attorney's substandard performance, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.  Petitioner then "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id*. at 694. Petitioner must show "significant prejudice" in a noncapital context. *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994)(*citing Spriggs v. Collins*, 993 F.2d 85, 88 n. 5 (5th Cir. 1993)).

Judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. A court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance while recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms." *Id*. at 690.

In addition, federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). Where the state court adjudicated an ineffective assistance claim on the merits, this Court must review petitioner's claim under both *Strickland* and § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions fell below *Strickland's* standard – it is

"whether the state court's application of the *Strickland* standard was unreasonable."

*Harrington*, 562 U.S. at 101.

**B.      Guilt/Innocence Phase**

*1.      Petitioner's Written Statement*

On August 6, 2007, shortly after his arrest, Petitioner signed a statement titled "Voluntary Statement."   (D.E. 6-6, Pages 5-7).   Petitioner signed and initialed the statement which states:

> These rights were read to me before I made this statement.  I understand my rights and give them up before and during the making of this statement.  No one has threatened me, forced me, or promised me anything to make me give up my rights and make this statement.  This is my statement:
>
> I was molested many times as a child by my uncle, Jose Soliz Jr. (aka Pepe), and it might have caused me to do what I have done.   Sunday August 5, 2007 at about 11 something I touched my 5 year old step daughter, [A.G.],[4] on her butt with my hand over her skin and kissed her lips with my lips.  I had an erection because I was stimulated by touching her.
>
> I have touched her butt about less than ten times in a 3 year period, but I have never penetrated her vagina or rectum.  I have let her touch my penis one time before for a brief moment about six months ago, but I felt ugly inside.  That time I also had an erection because she was real close to me and kissing my lips.  That time I was lying on my bed watching television when she went over my face and started to kiss me.  I got the erection on my penis and she saw it.  She went down to touch my penis, but I pulled my penis out of my boxers to let her touch it and put it back in my boxers.
>
> I have never penetrated her before.  I know that she has rashes on her butt consistently but it has nothing to do with me doing anything to her.  I am requesting that I get help for what I have done to [A.G.].  (D.E. 6-6, Pages 5- 7).

---

[4]Throughout this M & R, the minor child will be referred to by initials rather than by name.

Petitioner alleges counsel was ineffective for failing to investigate and present evidence regarding Petitioner's background and the voluntariness of the above statement, for withdrawing the motion to suppress the statement and for failing to request a jury instruction on voluntariness.  (D.E. 1, Pages 3-6; D.E. 6-8, Page 19, D.E. 13, Pages 36-45).  Petitioner, citing to his own testimony, asserts he did not say the words in the written statement, specifically denying the actions involving A.G, but he does not deny that he signed the statement.  (D.E. 13, Page 37 and D.E. 5-26, Pages 27-28 and 34-36).  Petitioner argues Detective Gonzales typed the statement for him to sign, it was not read to him and he did not read it before signing it.  (D.E. 5-26, Pages 27-28 and 34-36).  Petitioner further cites to the opinion of psychologist Paul Hamilton whose report, admitted after trial at the motion for new trial hearing, stated Petitioner has "an emotional disturbance in combination with certain personality characteristics that led him to sign a sworn, written statement without fully reading it and understanding its content, thereby rendering it unknowing and involuntary."  (D.E. 6-6, Pages 37-38 and D.E. 6-7, Pages 1-21).[5]

It is undisputed that Arturo Gonzalez, the detective who interrogated Petitioner the night of his arrest, typed the above written statement that was then signed by Petitioner.[6]

_____

[5]After the introduction of Petitioner's psychologist's report, the state introduced the report of Dr. Joel Kutnick who found, after psychiatric evaluation as well as a review of the evidence and trial testimony, that Petitioner had no specific cognitive defects or attentional disorder which prevented him from understanding his rights.  (D.E. 6-10, Pages 29-39).

[6]Detective Gonzalez testified Petitioner gave an oral statement that was not recorded due to an equipment malfunction and that, after and as a result of the malfunction, he then typed the written statement for Petitioner to sign.  (D.E. 5-25, Pages 16-20 and 22).  Detective Gonzales further testified Petitioner did not want to write it himself because he did not spell well. (D.E. 5-

Petitioner's trial counsel filed a motion to suppress the statement as involuntary which he then withdrew during a hearing before the trial.  (D.E. 6-8, Pages 53-54, 81-82 and D.E. 5-21, Page 4).  During the motion for new trial hearing, Petitioner's trial counsel testified he concluded the written statement was properly obtained and voluntary so he developed a new strategy not to object to the written statement so the jury would hear the police failed to record the interview.[7]  (D.E. 6-3, Pages 7-8 and D.E. 6-4, Page 28).  Petitioner's trial counsel further testified he did not believe it necessary to have Petitioner psychologically examined based on his meetings with his client and his client's family as no one informed him Petitioner was slow in school or expressed concern with Petitioner's mental or psychological condition.  (D.E. 6-3, Pages 8-10 and D.E. 6-4, Pages 28-31).

Petitioner now argues this strategy was not sound because Petitioner's trial counsel did not inadequately investigate Petitioner's background and the voluntariness of the statement.  (D.E. 13, Pages 41 and 43).  Petitioner asserts the written statement was involuntary based on his history of intellectual, emotional and psychological deficiencies and Petitioner's trial counsel should have moved to suppress it for these reasons.  (D.E. 13, Page 43).  Petitioner further asserts that had the trial court denied the motion to

---

25, Pages 16-19).  Detective Gonzalez testified he then typed the above written statement based on what Petitioner told him during the interview, Petitioner then read the statement and signed it. (D.E. 5-25, Pages 16-19 and 21-22).  Petitioner wrote on the statement himself, "No statement I'll let them type it out for me."  (D.E. 6-6, Page 6).

[7]Specifically, Petitioner's trial counsel testified, "At that point in the hearing, it did not appear to me that there was any procedural problem with the – how the statement was obtained.  In other words, Miranda warnings had been given.  Mr. Cueva indicated understanding what he was doing, the voluntariness of making the statement.  At that point, it appeared to be more beneficial to me to have the videotape, present it to the jury, and use that as an explanation of how the investigation had been botched."  (D.E. 6-3, Page 8).

suppress, Petitioner's trial counsel should have presented evidence on voluntariness and obtained an instruction in the charge. (D.E. 13, Page 43).

The Thirteenth District Court of Appeals ("state court"), upholding the trial court's determination,[8] held Petitioner's trial counsel's decision to abandon the motion to suppress was a reasonable trial strategy to show how the police investigation was mishandled, noting there was no indication in the record Petitioner expressed to his trial counsel that "he was too slow or emotionally impaired to voluntarily make the statement in question." (D.E. 5-5, Pages 26-30). "Rather, at trial, [Petitioner] claimed only that he did not read the statement because he knew the officer in question and trusted him to have typed it up correctly." (D.E. 5-5, Page 30).

To be entitled to relief from the state court, Petitioner would have had to show that counsel's performance was deficient in accordance with the *Strickland* standard outlined above. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687. With respect to the duty to investigate,

> "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision

---

[8]The CCA refused Petitioner's PDR and denied his state habeas application without written order. (D.E. 5-12, Page 1 and D.E. 6-12, Page 1). The parties agree the findings of fact and conclusions of law in Petitioner's state habeas action were not adopted by the CCA. (D.E. 13, Page 17 and D.E. 8, Page 18). Therefore, the undersigned will "look through" and evaluate the last reasoned state court decision. *Bledsue*, 188 F.3d at 256. The last reasoned state court decision in this matter is the Thirteenth District Court of Appeals ("state court") decision.

not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." *Id.* at 690-91.

Petitioner again asserts, as he did in his state habeas petition, that his written statement was involuntary and his trial counsel "did not have a sound strategic reason for his conduct," namely deciding not to pursue a motion to suppress. (D.E. 13, Page 44). Petitioner further argues the state court unreasonably applied the law when making its determination. However, as thoroughly discussed and reviewed by the state court, Petitioner's trial counsel's actions were the result of reasonable trial strategy and counsel "had no reason to believe that [Petitioner] could raise a legitimate challenge to the voluntariness of the statement." (D.E. 5-5, Pages 26-30). Petitioner's trial counsel testified he, after review, formulated a strategy to allow the written statement, which he believed to be admissible and voluntary, into evidence to demonstrate the deficiencies in the interrogation where the statement was obtained and the overall mishandling of the investigation. (D.E. 6-3, Page 8). Petitioner's counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 789.[9] Further, the state

---

[9]"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to

court properly considered the opinion of Dr. Hamilton in contrast to the opinion of Dr. Kutnick.  (D.E. 5-5, Pages 29-30).

Given these circumstances, reasonable jurists could not debate or find wrong the conclusion that counsel's strategic decision is entitled to deference under the *Strickland* standard.   Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record.  Therefore, it is recommended relief be denied on this claim and summary judgment be entered for Respondent on this issue.

2.   *Detective Gonzalez's Testimony*

Detective Arturo Gonzalez, the detective who interrogated Petitioner shortly after his arrest and who typed the written statement for Petitioner to sign as discussed above, testified at the trial that Petitioner admitted to him during questioning that he had committed indecency with a child.  (D.E. 5-25, Pages 13-30).  Specifically, Detective Gonzalez testified he explained Petitioner's Miranda warnings to him, had Petitioner

---

conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (citations omitted).

initial and check each one after they were read them to him, and then asked Petitioner if he understood his rights to which Petitioner responded yes.   (D.E. 5-25, Pages 14-16). Detective Gonzalez then testified the video recorder taping the approximately 20- minute long interrogation had malfunctioned, which he did not realize until he went back to review the tape a few minutes after the interrogation had concluded.  (D.E. 5-25, Pages 16-17).  Detective Gonzalez then testified Petitioner had started crying at the beginning of the interrogation and Petitioner stated "part of the reason it probably happened was because he was molested as a child," he had touched A.G. more than ten times in a three-year period, would get sexually aroused when he touched A.G.'s butt and kissed her on the lips, he let A.G. touch his penis one time but "felt ugly after he did that," that he was sorry for what he did and he never penetrated A.G..  (D.E. 5-25, Page 17).

Petitioner asserts Detective Gonzalez's testimony was inadmissible pursuant to Texas Criminal Procedural Code Art. 38.22 § 3(a) which states oral statements made by a defendant as a result of custodial interrogation must be recorded to be admissible.  (D.E. 13, Pages 45-49).  Therefore, Petitioner asserts trial counsel was deficient for failing to object to this testimony.  (D.E 13, Pages 45-49).  Petitioner argues his trial counsel "could have demonstrated that the police failed to record the interview and still excluded the inadmissible oral statements" and therefore, "his claimed strategy was unsound." (D.E. 13, Page 47).

The state court held the oral statements "were similar to, if not the same as, admissions made by [Petitioner] in his written statement…" and as such, "[t]he failure to object to cumulative evidence is harmless and will not support a claim of ineffective

assistance of counsel." (D.E. 5-6, Pages 16-17). The state court further found Petitioner's "[c]ounsel could also have made a reasonable decision to allow the statements into evidence, along with the circumstances under which they were made, in order to challenge the credibility of the police and, by extension, the credibility of all those responsible for gathering and presenting evidence against him." (D.E. 5-6, Pages 16-17). The state court held that "[u]nder the circumstances and affording great deference to counsel's ability, we cannot conclude that it was not sound and reasonable on the part of counsel to decide to not object to the testimony regarding [Petitioner]'s oral statements in order to show how the investigation had been mishandled." (D.E. 5-6, Page 17).

As with Petitioner's written statement, to be entitled to relief from the state court, Petitioner would have had to show that counsel's performance was deficient in accordance with the *Strickland* standard outlined above. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687. Petitioner asserts, as he did in state court, that his trial counsel's strategy was unsound and the evidence is not cumulative. (D.E. 13, Pages 45-49). Petitioner further argues the state court unreasonably applied the law when making its determination.

However, as with Petitioner's written statement, the state court found Petitioner's trial counsel's actions were the result of reasonable trial strategy. (D.E. 5-6, Pages 16-17). Petitioner's trial counsel testified he formulated a strategy to demonstrate the deficiencies in the interrogation and the overall mishandling of the investigation. (D.E. 6-3, Page 8). As discussed above, "judicial scrutiny of counsel's performance must be

highly deferential and it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 U.S. at 689 (citations omitted).  Petitioner's counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 789.

Further, even if Petitioner established this evidence was improperly admitted and his counsel's performance was deficient, he must also establish that the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  This testimony, as held by the state court, was largely cumulative when compared to Petitioner's written statement in the record. Petitioner has not shown how the exclusion of this testimony would have affected the outcome of the trial as "[t]here can be no prejudice when damaging evidence that should not have been admitted is merely cumulative of evidence that was properly admitted." *Morin v. Thaler*, 37 Fed. App'x 445 (5th Cir. 2010)(citation omitted).  Because the testimony was cumulative of other evidence, Petitioner cannot demonstrate that but for counsel's failure to object the results of the trial would have been different.  *See Strickland*, 466 U.S. at 694.

Therefore, Petitioner has not shown counsel's performance fell below an objective standard of reasonableness or that even if it did, that deficient performance prejudiced his defense.  Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an

unreasonable determination of the facts based on the evidence in the record.  As such, it
is recommended relief be denied on this claim and summary judgment be entered for
Respondent on this issue.

> 3.    *Use of the word victim and references to sexual assault and place of sexual*
> *assault*

Petitioner next alleges his trial counsel was ineffective for referring to the A.G. as
the "victim" and for failing to object to others numerous references to A.G. as the
"victim," including the prosecutor and several witnesses.  (D.E. 13, Pages 49-53).  It is
undisputed that the word "victim" was used multiple times throughout the trial.  (D.E. 34,
Pages 49-50).    Petitioner further alleges his trial counsel was deficient for failing to
object to police officer Eduardo Tagle's testimony about where the "crime took place"
and "sexual assault occurred,"[10] registered nurse Carol McLaughlin's testimony that she

---

[10]Officer Tagle, when he was asked if he had taken any photographs of the scene, stated "I took
photographs of the house and the bedroom where the crime took place."  (D.E. 5-23, Page 5).
After being asked about what other photographs he took, he stated "I took of the front of the
house.  That is pretty much what we do of the actual house.  Then we go into where the crime
took place, take pictures there as well."  (D.E. 5-23, Page 5).  Officer Tagle then responded to
additional questioning about several photographs stating: "This is the front photo of the
residence.  This is showing the address to the residence and this is the bedroom and the mattress
where the sexual assault took place;" "This is [the] residence that we were dispatched to, front of
the house.  Picture we take just to show the house, where the crime occurred;" "That's the
bedroom where the sexual assault occurred and the mattress;" and "Another picture of the bed
where the assault took place."  (D.E. 5-23, Pages 5-6).  Officer Tagle further testified that "Well,
the mother explained to me which bed the sexual assault took place on and which bed he jumped
over to" after being asked by Petitioner's trial counsel  "Who took you in there and showed you
these beds and told you this what you had been calling the scene where the sexual assault took
place?  Who put you in there?"  (D.E. 5-23, Page 8).  Officer Tagle then stated A.G.'s mother
explained to him "which was the daughter's bed where the crime took place and which was their
bed which he jumped over to."  (D.E. 5-23, Page 9).  Further, after being asked by Petitioner's
trial counsel about why he collected the evidence including the bed sheets, Officer Tagle testified
"That's where the sexual assault of a child crime took place and it needed to be collected…just
in case there is semen, hair, anything on those sheets."  (D.E. 5-23, Pages 13-14).  Mr. Perkins

treated A.G. "right after something had happened to her,"[11] and Detective Gonzalez's testimony that he believed a sexual assault occurred, even in the absence of semen.[12] (D.E. 13, Pages 53-56; D.E. 5-23, Pages 5-14 and 40-41; and D.E. 5-25, Pages 28-29). Petitioner also asserts counsel was deficient for referring during his cross examinations to the "scene where the sexual assault took place," "after the assault happened," and "in between the assault and you."[13]   (D.E. 13, Pages 53-56; and D.E. 5-23, Pages 4, 8, and

---

then asked Officer Tagle, "Did you follow through on the testing of any of that evidence?" to which Officer Tagle responded, "No." (D.E. 5-23, Page 14).  Mr. Perkins then asked, "As you sit here today, do you know what the results of the testing of that evidence, if any, was?" to which Officer Tagle responded, "I don't, no, sir." (D.E. 5-23, Page 14).

[11]Nurse McLaughlin, a certified pediatric sexual assault nurse examiner, when asked by Petitioner's trial counsel if she gathered evidence during her examination of A.G. testified that she gathers "evidence if it falls within the period of time that evidence collection is recommended, and I do it as a courtesy but nothing else" and she had gathered evidence in this case "[b]ecause I saw [A.G.] right after something had happened to her." (D.E. 5-23, Pages 40-41).

[12]Detective Gonzalez testified, in response to the prosecutor's questions, that Petitioner was not innocent just because no semen was found on A.G's panties.  (D.E. 5-25, Page 28).  Detective Gonzalez was asked, based on A.G.'s mother's description of the incident, whether "as a detective, did you assume this was just an accidental situation where the defendant's erect penis would be directly behind the victim's buttocks area?" to which he responded, "No." (D.E. 5-25, Page 29).  Detective Gonzalez was then asked whether, based on his experience as a detective, "What did you think was going on here?" to which he responded, "I believe there was a sexual act going on, also….because of – the mother told me that [A.G.'s] butt hole was enlarged and had a rash." (D.E. 5-25, Page 29).

[13]As stated previously, Mr. Perkins asked Officer Tagle, "Who took you in there and showed you these beds and told you this what you had been calling the scene where the sexual assault took place?  Who put you in there?" (D.E. 5-23, Page 8).  Officer Tagle responded that it was A.G.'s mother.  (D.E. 5-23, Page 8).  When cross-examining Nurse McLaughlin, Mr. Perkins asked her, "The child told you that she had wiped or washed since the incident took place that she had urinated since the incident took place?  Post-assault hygiene which means after the assault happened?" (D.E. 5-23, Page 41).  Nurse McLaughlin replied, "Before she saw me, yes." Mr. Perkins then asked "In between the assault and seeing you [A.G.] told you that she had wiped and washed herself?" to which Nurse McLaughlin replied in the affirmative.  (D.E. 5-23, Page 41).  While cross-examining A.G.'s mother, Mr. Perkins, while pointing out the conflicting

41).   Petitioner asserts these references to Petitioner's guilt and a crime occurring were not based on sound strategy and undermined Petitioner's testimony that he was not guilty. (D.E. 13, Page 55).

   As to the use of the word victim, the state court found Petitioner's trial counsel's testimony credible, specifically that he "did not object to the use of the word 'victim' because he did not believe it was practical to restrict the labels used to identify the parties in this manner" and "because he did not believe the references were harmful [to the defense] because jurors expected the use of such terms and were not influenced by their use." (D.E. 5-5, Pages 33-34 and D.E. 6-3, Pages 23-24).   Further, the state court found "counsel's performance as it related to the use of the word 'victim' was not deficient" as such terms "are commonly used at trial in a neutral manner to describe the events in question and, in context, carry no implication that the person using such terms has an opinion one way or another about the guilt of the defendant." (D.E. 5-5, Page 34).   The state court also thoroughly distinguished the facts from the cases cited by Petitioner, which are the same cases cited in his current Response, from Petitioner's case, finding that, "[c]ounsel's performance in each [cited] case arguably suggests a personal opinion that a crime occurred" whereas the use of the word "victim" in this case carried no implication that the person using the term had any opinion about Petitioner's guilt.  (D.E.

---

testimony regarding whether A.G. wiped herself, urinated or ate prior to her physical examination, asked, "You understand [A.G] has told the nurse that she did all three of those things after the assault took place and before she was examined?"  (D.E. 5-24, Page 4).

5-5, Pages 30-33);[14] *see also Tollefson v. Stephens*, Nos. SA:14-CV-144 and SA:14-CV-171-DAE, 2014 WL 7339119, at *5-6 (W.D. Tex. Dec. 23, 2014).   The state court concluded that counsel's performance was not deficient as the use of the "victim" did not cause prejudice sufficient to undermine confidence in the result of the proceeding as the "term 'victim' is relatively mild and non-prejudicial especially given that courts have held invocation of far stronger terms did not result to reversible error." (D.E. 5-5, Page 34).

As to references of sexual assault, the state court examined the complained-of testimony and found Petitioner's trial counsel's actions were not deficient and Petitioner had failed to demonstrate counsel performed below an objective standard of reasonableness.   (D.E. 5-5, Pages 35-39).   Specifically, when examining the police officers' testimony, the state court found credible Mr. Perkins' testimony that he did not object because jurors expect officers to testify using that language and he did not perceive it as suggesting an assault or crime occurred, his questioning as to where the sexual assault occurred was strategic as it was designed to show that A.G.'s mother claimed something happened without actually seeing it, his references to the scene of the crime did not communicate a belief that a crime actually occurred as such terms "are commonly used at trial in a neutral manner to describe the events in question and, in context, carry

---

[14]Petitioner also cites to *State v. Wigg* in support of his position.  889 A.2d 233 (Vt. 2005). However, while the Vermont Supreme Court found the police detective's reference to a complainant as a "victim" was outweighed by the danger of unfair prejudice, the ultimate conclusion was the error was harmless under the circumstances as the detective indicated he was using a term viewed as synonymous with complainant and the jury would not have returned a different verdict had the detective used "different and more neutral terminology."  *Id.* at 237.

no implication that the person using such terms has an opinion one way or another about the guilt of the defendant," and his questioning of Nurse McLaughlin and A.G.'s mother was "framed in a way that [A.G.] was suggesting that an assault took place" rather than communicating counsel's own opinion and, when reviewed in context, counsel was attacking A.G.'s credibility.  (D.E. 5, Pages 35-39; D.E. 6-3, Pages 24-28; and D.E. 6-4, Pages 5-8).  Again, the undersigned agrees.

When viewing all the complained of testimony in context, the reasoning of the state court is sound.  Trial counsel's reference to A.G. as "victim," his failure to object to the use of the term "victim," and the use of the terms relating to "sexual assault" do not constitute deficient performance and even if it was, Petitioner has not demonstrated any prejudice. *See Strickland*, 466 U.S. at 694.  Further, Petitioner has not demonstrated that the state court's conclusion is contrary to or an unreasonable application of clearly established federal law or unreasonable in light of the evidence presented and as such, it is recommended relief be denied on this claim.  Therefore, it is recommended relief be denied on this claim and summary judgment be entered for Respondent.

### 4.    *Testimony regarding A.G.'s truthfulness*

Petitioner next alleges his trial counsel was deficient for eliciting testimony from A.G.'s mother,[15] Nurse McLaughlin[16] and professional mental health services counselor

---

[15]On cross examination, Mr. Perkins asked A.G's mother, "Do you have any evidence to present to this jury that this incident was repeated on prior occasions?"  A.G.'s mother responded, "My daughter should be more than—she told me.  I believe her.  I walked in on it.  I don't know what other evidence you need." (D.E. 5-24, Page 4).  Mr. Perkins then asked her, "Your daughter told you and you believe her?" to which she responded, "Yes, I do."  (D.E. 5-24, Page 4).  Mr. Perkins then asked, "You believe everything your daughter tells you?" to which she replied,

Dennis Ramos[17] relating to A.G.'s truthfulness about the allegations of sexual assault.

(D.E. 13, Pages 56-59).    Specifically, Petitioner asserts Mr. Perkins was deficient for

---

"Yes." (D.E. 5-24, Pages 4-5). Mr. Perkins then proceeded to question her about discrepancies in A.G.'s statements to her versus the nurse who examined A.G. after Petitioner's arrest. (D.E. 5-24, Page 5). Mr. Perkins then asked, "You believed [A.G.] when you told her that Charles had told her not to tell anybody because he would hurt you?" to which she responded, "Yes, because he had before." (D.E. 5-24, Page 6). A.G.'s mother then testified that there was no indication A.G. was afraid of Petitioner but that after the incident, she believed what her daughter had told her "because I had seen it with my own eyes." (D.E. 5-24, Pages 6-7). Mr. Perkins then questioned her about why she continued in a relationship with Petitioner after the incident if she believed A.G. (D.E. 5-24, Pages 6-8).

At the motion for a new trial hearing, Mr. Perkins testified A.G.'s mother's testimony supported his defense theory that A.G. was lying "[b]ecause [A.G.'s mother] had to immediately recant that belief [that A.G. always told her the truth] because she, on the next page, had to tell the jury that [A.G.] was not telling her the truth. (D.E. 6-4, Page 14).

[16]On cross-examination, Mr. Perkins questioned Nurse McLaughlin about whether A.G. had told her if she had urinated, wiped herself, or consumed food or water. (D.E. 5-23, Pages 41-42). Nurse McLaughlin testified that A.G. told her she had urinated, wiped, and drank water prior to being examined. (D.E. 5-23, Page 41). After testifying that five year olds can sometimes be manipulated, Mr. Perkins asked "Never had a five-year old tell you something that was not true?" to which she replied "Most five-year olds would rather not tell me anything or tell me like it is.  Sure, I have had one or two lie to me in some way.  I am sure one of them would tell me that the blue monster came out of the closet.  I have had a couple do that.  I have had a five-year old tell me that somebody was an alien.  But in their mind, this was true to them.  I have had five-year olds lie to me but in the content, it would depend on the content." (D.E. 5-23, Page 42).

At the motion for a new trial hearing, Mr. Perkins testified his strategy was the same as it was for his strategy as to Mr. Ramos, namely to demonstrate that Nurse McLaughlin's opinion was baseless, biased or incredible. (D.E. 6-4, Page 10)(*See* footnote below). Mr. Perkins also stated, "She never did testify that [A.G.] was telling the truth. She left it obviously in the air. The unspoken conclusion was that [A.G.], as a five year old, is unlikely to have been lying about what she told the nurse." (D.E. 6-4, Page 11).

[17]On cross-examination, Mr. Perkins asked Mr. Ramos, when questioning him about how he determines if abuse has taken place and how to determine if a child is lying, "Now, in your opinion, if a child says they are sexually abused, is there any questions in your mind that the said abuse has taken place?" to which he responded, "I evaluate that, but my experiences is that it's very rare that a child will lie about those things." (D.E. 5-25, Page 7). Mr. Perkins then asked, "Have you never met a child who has lied about being sexually abused?" to which Mr. Ramos replied, "I have met probably two, and they were old children, 14 or 15 years old." (D.E. 5-25,

soliciting opinion testimony regarding whether A.G. was telling the truth about being sexually assaulted and there was no sound strategy for doing so.

The state court examined the complained-of testimony and found Petitioner's trial counsel's actions were the result of reasonable trial strategy. (D.E. 5-5, Pages 39-47 and D.E. 5-6, Page 1). In short, the state court found that while a direct opinion of the truthfulness of a child or a class of persons to which the complainant belongs is inadmissible, Mr. Perkins strategy to elicit this testimony to attack the credibility and opinions of A.G.'s mother, Nurse McLaughlin and Mr. Ramos as well as the credibility of A.G. was sound and any deficiency in his actions was not prejudicial as the testimony was from witnesses who had shown themselves to be biased against Petitioner. (D.E. 5-5, Pages 39-47 and D.E. 5-6, Page 1). While other lawyers may have handled these examinations differently, Mr. Perkins' trial strategy does not amount to ineffective

---

Page 7). Mr. Perkins also asked "How do we know if a child is lying about sexual abuse?" to which Mr. Ramos responded, "The only way that I know to determine that is if they admit that they have lied." (D.E. 5-25, Page 7). Mr. Ramos also testified that, "I generally evaluate the possibility of lying. It has been very rare that I have seen children lie about being abused, especially in—I have never seen a younger child lie about being abused." (D.E. 5-25, Page 7).

At the motion for a new trial hearing, Mr. Perkins testified his strategy was to demonstrate that Mr. Ramos' opinions "were not very well founded." (D.E. 6-4, Page 8). Specifically, that he was "setting him up because his testimony in my opinion up to that point had been fairly ludicrous and I was trying to demonstrate the absurdity of his premises by asking those questions couched in a way…I was trying to demonstrate that his premises were fairly far stretched." (D.E. 6-4, Page 8). Mr. Perkins further testified that while he considered the possibility that the jury might find Mr. Ramos credible, he felt "that the questions were more important and would probably overcome that" as he "pointed out that he had not interviewed [A.G]. He did not know anything about the facts in the case. He had not bothered to talk to [Petitioner] or read any of the offense reports. He had zero familiarity with the case, yet he was in here offering all sorts of unsubstantiated opinions which he could not very well defend and it was my strategy to demonstrate to the jury that he was simply over the top, clearly a State's witness, and not to be believed." (D.E. 6-4, Page 8).

24 / 69

assistance of counsel. *Strickland*, 466 U.S. at 689 (citations omitted)("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.")

When viewing the testimony in context and Mr. Perkins' testimony regarding his defense strategy, Petitioner has not shown counsel's performance fell below an objective standard of reasonableness or that even if it did, that deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 694; *See also Harrington*, 562 U.S. at 789. Petitioner's counsel was "entitled to formulate a strategy that was reasonable at the time." *Harrington*, 562 U.S. at 789. Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record. Therefore, it is recommended summary judgment be entered for Respondent on this issue.

5.    *Police testimony about Petitioner minimizing his conduct in his written statement*

Petitioner next alleges trial counsel was ineffective for failing to object to police opinion testimony that Petitioner minimized his conduct in his written statement by asserting that he only touched A.G. and did not penetrate her. (D.E. 13, Pages 59-61). Petitioner asserts that Mr. Perkins did not have a strategic reason for this testimony, erroneously believing it to be admissible, and therefore, his failure to object constituted deficient performance. (D.E. 13, Page 61).

Detective Gonzalez was asked by the prosecutor, "Have you found that defendants will sometimes minimize what they did?" to which he replied, "Yes, they do." (D.E. 5-25, Page 18). Detective Gonzalez was then asked, "Did you see that in this case?" to which he replied, "Yes, I did." (D.E. 5-25, Page 18). Detective Gonzalez was then asked "How?" to which he replied, "As far as him saying, Oh, I just touched her. After the victim outcried to her mother, saying that she was penetrated, he minimized it, saying, No, all I did was touch her. I never penetrated her. I just let her touch me. That's minimizing the situation." (D.E. 5-25, Page 18).

Mr. Perkins, after acknowledging a police officer cannot give opinion testimony that the defendant was lying, testified he did not see this testimony "as accusing the defendant of lying. Any officer is going to—again, it goes back to the premise that a police officer testifying in a criminal case obviously is going to be expected to believe in the truth of his case and the untruth of the defendant's plea of not guilty otherwise he would be a fairly ineffective witness for the State and so following up on that premise, I don't think it is at all unusual for a police officer to suggest that what the defendant is telling him may not comport with the facts. But, you know, calling him a liar is making that stretch, I think, a little much from that question and answer." (D.E. 6-4, Page 4). Mr. Perkins testified that while he did not object to the testimony, it was "part of [his] strategy not to object unnecessarily when there was testimony that [he] did not believe was particularly harmful taking place." (D.E. 6-4, Page 5). He further testified that, "When I am persuaded that a witness is doing something that is clearly improper and that is obviously harmful and damaging, I object. The record, I am

sure, is fully of plenty of examples of where I objected, and those objections were sustained." (D.E. 6-4, Page 5).

The state court found the testimony was permissible lay opinion testimony as it did not "involve a direct opinion that [Petitioner] lied in his statement or that [Petitioner] was guilty about the offense. Rather, Detective Gonzalez testified to the facts he observed—that [Petitioner] admitted he touched a child but did not penetrate her and that he let her touch him.  Detective Gonzalez explained that a defendant will do this in an attempt to 'minimize the situation.'" (D.E. 5-6, Page 18).

Petitioner asserts that testimony regarding minimizing his offense infers that he is not telling the truth and Detective Gonzalez's belief that Petitioner committed aggravated assault.  Petitioner then cites to several cases which all properly assert that a police officer cannot testify that he believes the defendant is guilty.  (D.E. 13, Page 60). However, Petitioner acknowledges the Fifth Circuit's decision in *Charles v. Thaler*.  629 F.3d, 494 (5th Cir. 2011).[18]   In *Charles*, a Texas Ranger testified that he "felt like [Charles] was minimizing his role" in the crimes.  *Charles*, 629 F.3d at 500.  The Fifth Circuit held that, "Because the state determined that [the Texas Ranger's] testimony was permissible lay opinion under state evidentiary law notwithstanding his comment on Charles's attitude, a federal habeas court may not conclude otherwise."  *Id*. at 500-01

---

[18]Petitioner's counsel acknowledges he is aware of the holding in *Charles* as he also represented the Petitioner in that case and, "Although this Court is bound by the Fifth Circuit's decision in *Charles*, [P]etitioner preserves this issue so that, if necessary, he may ask the Fifth Circuit to reconsider *Charles* or the Supreme Court to overrule it."  (D.E. 13, Page 61).

(holding it is not the function of a federal appellate court in a habeas proceeding to review a state court's interpretation of its own law…")(citations omitted).

"Under §2254, federal habeas courts sit to review state court misapplications of *federal* law.  A federal court lacks authority to rule that a state court incorrectly interpreted its own law.  When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."  *Id*.  Therefore, it is recommended relief on this claim be denied as the state court found this testimony was admissible.  Trial counsel is not deficient for failing to raise groundless objections.  *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite).

The state court denied relief on this claim.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Therefore, it is recommended summary judgment be entered for Respondent on this issue.

### 6.    *Hearsay Testimony*

Petitioner next alleges his trial counsel was ineffective for failing to object to and eliciting inadmissible hearsay testimony about the offenses from A.G.'s mother.  (D.E. 13, Pages 62-67).  Specifically, Petitioner objects to the testimony of A.G.'s mother regarding what A.G. told her about the offenses and why A.G. said she did not previously

tell anyone they were occurring.[19]   Article 38.072 of the Texas Code of Criminal Procedure provides an exception to the hearsay rule of certain sexual abuse victims' statements, allowing for an adult outcry witness to testify as to what he or she was told by a child sexual assault complainant about the offense.

While Petitioner does not dispute the admissibility of outcry statements, he asserts counsel was ineffective for not objecting to certain testimony of A.G.'s mother as

---

[19]A.G.'s mother was asked by the prosecution, "All right.  Did you see his penis sticking out at the time he was behind your daughter.  Could you see that?" to which she replied, "Yes, I could. He was completely erected."  (D.E. 5-23, Page 24).  A.G.'s mother was then asked, "With the boxer shorts, was there a hole in the boxer short?" to which she replied, "Yes.  The boxers had a hole or had a button.  I'm not sure whether it had a button or a slit, but there is access to it through the front."  She was then asked, "Did you ask your daughter what had happened?" to which she replied, "As soon as Aaron had help[ed] me take my kids out to the car, the cops got there, went and arrested him and I asked my daughter if this was the first time and she said no. She said it had happened before in the apartment where we lived with the puppy…"  (D.E. 5-23, Page 4).  A.G.'s mother further testified, "She said it had happened more than once.  She did not specify exactly when.  She just said whenever I would shower or leave."  (D.E. 5-23, Pages 4-5). A.G.'s mother also testified, "I simply asked her was this the first time.  She said no mommy. This is not the first time.  She would tell me.  I'm sorry.  I'm sorry.  I tried to explain to her that it was not her fault.  She would—I asked her when the first time was and she would me that it happened, of course, there in Robstown and in Mission where we lived in the apartments."  (D.E. 5-23, Page 25).  A.G.'s mother was later asked, "Was the redness different from the rashes she had had?" to which she replied, "Yes.  The rashes usually are not as red when I saw her.  Her private was redder than usual.  She would say it hurt her.  That's why when I took her to the hospital she was telling me, 'Mommy, it hurts me." So she told the nurse the same thing."  (D.E. 5-23, Page 25).

On cross-examination, Mr. Perkins asked A.G.'s mother, "Did you ask A.G. what happened?" to which she replied, "As soon as I put her in the car after the incident happened, I asked her: 'Is this the first time and what happened.' She told me it was not the first time.  She told me that [Petitioner] touched her.  I asked her why didn't you ever tell me.  She said because [Petitioner] said he would hurt mommy.  That is why."  (D.E. 5-23, Page 34).  Mr. Perkins then asked, "She told you that night that [Petitioner] had told her that he would hurt mommy?" to which she replied, "I asked her in the car.  Is this the first time.  She said no.  I said why didn't you ever tell me.  She said because [Petitioner] said he would hurt mommy if I would tell you."  (D.E. 5-23, Page 34).  Mr. Perkins then questioned her in detail about her written statements to the police, specifically why none of them included the above testimony. (D.E. 5-23, Pages 34-35).

inadmissible.    (D.E. 13, Pages 64-66).    The state court found "credible counsel's 'testimony that he was able to impeach [A.G.'s] mother with her non-responsive testimony by showing that the mother had not previously made these claims in the statement given to the police'" and his "'strategy to point out the mother's inconsistent testimony and that she was changing things she said in her prior testimony'" was a "'reasonable trial strategy in light of the fact that the mother's credibility was a key factor at trial.'"[20]    (D.E. 5-6, Page 3).    The state court concluded that Petitioner's trial "counsel's actions were not deficient and, even if they were deficient, they were not prejudicial, was not an abuse of discretion." (D.E. 5-6, Page 3).  The undersigned agrees.

When viewing the testimony in context and Mr. Perkins' testimony regarding his defense strategy and his follow up impeachment questions, Petitioner has not shown counsel's performance fell below an objective standard of reasonableness or that even if it did, that deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 694; *See also Harrington*, 562 U.S. at 789.  Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record.  Therefore, it is recommended summary judgment be entered for Respondent on this issue.

---

[20]Mr. Perkins testified at the motion for new trial hearing that the State gave a general notice that the outcry witnesses were going to testify to everything that was in the State's file and that he was given a copy of the file.  (D.E. 6-4, Page 19).  Mr. Perkins further testified that he had no notice of A.G.'s mother's statements at issue because she never made them before trial.  (D.E. 6-4, Page 19).  He further testified that he impeached her with the fact that she had not previously made the statement.  (D.E. 6-4, Page 20).

7. *Testimony regarding sexual assault of small children*

Petitioner acknowledges at the end of his argument on this issue that he did not raise it in his petition for discretionary review or in his state habeas proceeding. (D.E. 13, Page 69). Therefore, this issue has not been properly raised before the Texas Court of Criminal Appeals.

A petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. §2254(b). To do so, a petitioner must fairly present the factual and legal basis of any claim to the highest available state court for review prior to raising it in federal court. *See Sterling v. Scott*, 57 F.3d 451, 453 (5th Cir. 1995); *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993). In Texas, all claims must be presented, either in a petition for discretionary review or a state application for writ of habeas corpus, to the Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985); *Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986).

Petitioner has failed to exhaust this issue and Petitioner provides no sufficient reason why his failure to exhaust should be excused pursuant to § 2254(b)(1)(B). Consequently, it is recommended that Petitioner's requested relief on this claim be denied and summary judgment be entered for Respondent on this issue.

8. *Petitioner's Assault of A.G.'s Mother*

Petitioner asserts his trial counsel was ineffective for opening the door to, eliciting and failing to preserve error regarding A.G.'s testimony that Petitioner assaulted A.G.'s mother as well as A.G.'s mother's testimony that she was assaulted by Petitioner. (D.E. 13, Pages 69-72). Specifically, Mr. Perkins asked A.G.'s mother, "You believed [A.G.]

when she told you that [Petitioner] had told her not to tell anybody because he would hurt you?" to which she replied, "Yes, because he had before."  (D.E. 5-24, Page 6).  Mr. Perkins then asked, "You believed her when she said that?" to which she replied, "Yes. She's known what he has done to me."  Mr. Perkins then asked, "You never saw any indication of fear with her whenever you left her with him?" to which she replied "No." (D.E. 5-24, Page 6).  Shortly thereafter, Mr. Perkins asked, "So why then if you believed all of that, including what you claim that you saw that night did you continue on in a relationship with [Petitioner] after this incident?" to which she replied she needed to stay on good terms with him because of her son.  (D.E. 5-24, Page 7).  On redirect, the prosecutor asked, "You mentioned when he asked you about why she was afraid that he would hurt you.  You said that she's known what he has done to me."  (D.E. 5-24, Page 8).  Mr. Perkins then successfully raised an objection pursuant to Rule 403 before A.G.'s mother answered.  (D.E. 5-24, Page 8).  However, Petitioner asserts counsel was ineffective for failing to preserve the error by requesting an instruction to disregard or moving for a mistrial.  (D.E. 13, Page 70).

The state court found that "the record supports a finding that counsel made strategic decisions regarding this testimony," namely to show that "[A.G.'s] mother and grandmother were biased against [Petitioner] to the point that they compelled [A.G.] to fabricate the present charges."  (D.E. 5-6, Pages 8-9).  The Court further found that "counsel may have strategically decided not to request an instruction to disregard or a mistrial" to impeach her testimony about A.G.'s truthfulness and to avoid highlighting objectionable testimony.  (D.E. 5-6, Page 8).  The trial court found that failure to request

an instruction or request a mistrial was deficient performance because Mr. Perkins failed to preserve an error.  (D.E. 5-6, Pages 7-8).  However, both the trial court and the state court found no prejudice as "[s]imilar testimony had been elicited elsewhere, and counsel's actions were consistent with his trial strategy to show bias."  (D.E. 5-6, Page 9).  The state court concluded "there was not a probability sufficient to undermine confidence in the outcome that, but for counsel's failure to ask for an instruction or a mistrial, the result of the proceeding would have been different."  (D.E. 5-6, Page 9).

When viewing the testimony of A.G.'s mother in context, Petitioner has not shown counsel's performance prejudiced his defense. *See Strickland*, 466 U.S. at 694; *See also Harrington*, 562 U.S. at 789.  As found by the state court, trial counsel used A.G.'s mother's testimony to impeach credibility and then successfully objected to the prosecutor's further questioning on this subject.  "Counsel could have reasonably decided not to draw further attention to the comment by requesting that the jury be instructed to disregard it."  *Hatcher v. Quarterman*, No. G-08-0012, 2008 WL 2725064, at *9 (S.D. Tex. July 10, 2008).  Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record.

As to A.G.'s testimony, Mr. Perkins asked A.G, "How long did you stay inside the house?" to which she replied, "Before my mom called the police."  (D.E. 5-24, Page 19).  Mr. Perkins then asked, "Just up until they called the police, then your mom takes you out to the car after that?" to which she replied, "And then last time when he kicked my mom and push her--" (D.E. 5-24, Page 19).  Petitioner asserts his trial counsel should

have objected to A.G.'s answer as non-responsive, irrelevant, and inadmissible as character and/or extraneous offense evidence.  (D.E. 13, Page 70).  Further, after A.G. confirmed Petitioner and her mother were yelling at each other, Mr. Perkins asked, "Did you ever see her hit [Petitioner] that night?" to which she replied, "Yes and then [Petitioner] hit my mom, kick her and push her to the wall."  (D.E. 5-24, Page 22).  A.G. later again testified that she saw her mom hit the Petitioner and then the Petitioner hit her mom and then the police came.  (D.E. 5-24, Page 22).  Petitioner asserts his trial counsel should not have elicited this testimony as character and extraneous offense evidence is inadmissible.

The state court rejected Petitioner's arguments that this testimony was non-responsive or inadmissible as "the testimony provided by A.G. detailed actions that occurred after her mother observed the complained-of incident."  (D.E. 5-6, Page 20).  "This testimony did not concern a prior assault, as [Petitioner] asserts.  Instead, this testimony was about the night in question."  (D.E. 5-6, Page 21).  Accordingly, the state court found this evidence, "although unexpectedly volunteered by the witness on cross-examination" was admissible "as an assault against an adult witness...could be seen as tampering with the witness."  (D.E. 5-6, Page 21).

Petitioner fails to address the state court's conclusion, instead making the same arguments as previously presented to the state court that Mr. Perkins was deficient for permitting A.G. to testify about a prior assault.  (D.E. 13, Page 71).  When viewing A.G.'s testimony, the state court determined this testimony was admissible under state

law, and as such, this Court may not conclude otherwise.   *Charles*, 629 F.3d at 500 (federal court lacks authority to rule that a state court incorrectly interpreted its own law). Therefore, it is recommended relief on this claim be denied as the state court found this testimony was admissible and trial counsel is not deficient in failing to raise groundless objections. *Clark*, 19 F.3d at 966.   Further, Petitioner has failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.   Therefore, it is recommended summary judgment be entered for Respondent on this issue.

> 9.    *Victim Impact Testimony*

Petitioner next asserts Petitioner's counsel was ineffective for failing to object to A.G.'s mother testimony that she "gave up everything," namely her new job and her wedding plans as she expected to marry Petitioner and then "suddenly her life was turned upside down."  (D.E. 13, Pages 57-59).[21]   Petitioner asserts his trial counsel should have objected to this testimony as it is victim-impact evidence that is inadmissible at the guilt-innocence stage.

---

[21]A.G.'s mother was asked by the prosecutor, "Because of this incident did you have to give up that job?" to which she replied, "Yes."  (D.E. 5-24, Page 6).  She was then asked, "So because of this incident did you have to give up a wedding and give up a job?" to which she responded, "I gave up everything."   (D.E. 5-24, Page 6).   Shortly thereafter, Mr. Perkins, on re-cross examination, questioned her as to why she continued her relationship with Petitioner for months after the incident, including call him on "hundreds of occasions" and "continuing to have intercourse with him."  (D.E. 5-24, Pages 7-8).

The state court found this evidence was admissible as it was relevant as "rebuttal to [Petitioner's] defense that A.G.'s mother manipulated A.G. to fabricate the assault so that they could get back into the good graces of her family.  Based on the testimony that she lost both her wedding plans and her new job, A.G.'s mother would not be gaining anything by manipulating A.G.  Therefore, evidence of the impact of the incident on A.G.'s mother, although typically irrelevant, did, in this case, have a tendency to make more or less probable a fact of consequence at the guilt stage; that is, whether [Petitioner] committed the crime at all."  (D.E. 5-6, Pages 19-20).

The state court determined this testimony was permissible under state law, and as such, this Court may not conclude otherwise.  *Charles*, 629 F.3d at 500 (federal court lacks authority to rule that a state court incorrectly interpreted its own law).[22]  Therefore, it is recommended relief on this claim be denied as the state court found this testimony was admissible and trial counsel is not deficient in failing to raise groundless objections. *Clark*, 19 F.3d at 966.  Further, Petitioner failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Therefore, it is recommended summary judgment be entered for Respondent on this issue.

10.  *Testimony regarding anal sex and sexual release*

---

[22]Petitioner's counsel again acknowledges the holding in *Charles*, again stating, "Although this Court is bound by the Fifth Circuit's decision in *Charles*, [P]etitioner preserves this issue so that, if necessary, he may ask the Fifth Circuit to reconsider *Charles* or the Supreme Court to overrule it."  (D.E. 13, Page 61).

Petitioner next alleges his trial counsel was ineffective for failing to object to testimony from A.G.'s mother that Petitioner had previously expressed interest in having anal sex with her as well as the prosecutor's summation where this testimony was mentioned.  (D.E. 13, Pages 74-77).[23]  Petitioner asserts evidence of his interest in anal sex was character conformity evidence portraying him as a sexual deviant that was irrelevant to the issue of whether he anally assault A.G. and the prosecutor's arguments were beyond the permissible scope of closing arguments.  (D.E. 13, Page 75).

At the motion for a new trial hearing, Mr. Perkins testified the disputed testimony "was not particularly relevant but I knew where the prosecutor was going with it and expected that it would be allowed because of the context of what she claims she had seen in the room."  (D.E. 6-4, Page 16).  When asked, "So even though you recognize it was not relevant, you did not object because you assume[d] the court would overrule the objection?" to which he replied, "I had strategic reasons for discussing that and I knew I

---

[23]A.G.'s mother was asked by the prosecutor, "All right.  Let me ask you a little bit about, did [Petitioner], had he ever expressed interested to you in anal sex?" to which she replied, "Yes." (D.E. 5-23, Page 25).  She was then asked, "Was that something you wanted to do?" to which she replied, "No."  The prosecutor then asked A.G.'s mother, "Did you engage in any anal sex with him on occasion?" to which she replied, "I want to say we tried about twice."  She was then asked, "Did you express to him that you did not want to do that anymore?" to which she replied, "Yeah."  (D.E. 5-23, Page 25).

During her closing argument, the prosecutor stated, "We know that sex offenders, according to Dennis Ramos, will pick vulnerable women, women who may have lower self-esteem.  Keep all of that in mind.  Also keep in mind that on this date in question, Ruth and the defendant had not had sex.  He was looking to this child for sexual release.  Ruth was tired.  She was exhausted that day.  Presumably she was not going to stay up and have sex with him.  So who did he turn to? He turned to the daughter.  Also remember he wanted to have anal sex with Ruth, but Ruth did not want that.  So he only got to have that twice with her."  (D.E. 5-27, Page 53).  The prosecutor then turned her closing to Petitioner and A.G.'s mother's activities earlier in the day in question.

was going to discuss that with her as well.  They had been together in that room for a couple of weeks prior to the incident taking place.  [Petitioner] had explained to me that he and Ruth had engaged in anal sex in that room, and it was my theory that in all probability [A.G.] had observed this taking place and she was relating what had taken place to her or she had seen taken place between her mother and [Petitioner] rather than anything that had actually taken place with her." (D.E. 6-4, Page 16).  Mr. Perkins further testified that, "It was not strategic that [Petitioner] had expressed an interest [in anal sex] but that they had engaged in it.  I was not interested in the jury hearing he had an interest in anal sex, no."  (D.E. 6-4, Page 16).

The state court distinguished the cases cited by Petitioner, which are the same cases he cites in his current response, "because each involves a counsel's reoccurring failure to object to numerous instances of irrelevant testimony, involving, for example, homosexual experiences, promiscuity, and instability in the family—numerous extraneous and prejudicial matters which had a substantial and injurious effect on the verdict.  [Petitioner], in contrast, complains of one instance of testimony involving what is arguably irrelevant and inadmissible evidence."  (D.E. 5-6, Page 10)(citations omitted). The state court found "counsel may not have objected to the complained-of testimony in an effort to provide an alternate explanation for A.G.'s allegations-that A.G. was relating what she had seen taken place between her mother and [Petitioner] rather than anything that had actually taken place with her...[which] is supported by counsel's cross-examination of A.G.'s mother where he elicited testimony from her that she and [Petitioner] had been sexually active at times when the children where there, implying

that A.G. may have learned from this some of the things that she told the psychologist that were not appropriate for a five-year-old to know." (D.E. 5-6, Pages 12-13). The state court, deferring to the trial court's finding that it was a reasonable trial "strategy to show that A.G. was relating what she had seen take place between [Petitioner] and her mother, rather than what [Petitioner] had done to her," found Mr. Perkins' failure to object was not deficient and, even if it was, it was not prejudicial or an abuse of discretion on this ground. (D.E. 5-6, Page 13).

Given that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," when viewing the testimony in context and Mr. Perkins' testimony regarding his defense strategy, Petitioner has not shown counsel's performance fell below an objective standard of reasonableness or that even if it did, that deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 690, 694. Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record.

Additionally, Petitioner acknowledges at the end of his argument on this issue that he did not raise his objection to the "sexual release" language in his petition for discretionary review or in his state habeas proceeding. (D.E. 13, Page 80). Therefore, this issue has not been properly raised before the Texas Court of Criminal Appeals.

A petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. §2254(b). To do so, a petitioner must fairly present the factual and legal basis

of any claim to the highest available state court for review prior to raising it in federal court.  *See Sterling*, 57 F.3d at 453.; *Deters*, 985 F.2d at 795.  In Texas, all claims must be presented, either in a petition for discretionary review or a state application for writ of habeas corpus, to the Court of Criminal Appeals.  *Richardson*, 762 F.2d at 431; *Bautista*, 793 F.2d at 110.

Petitioner has failed to exhaust this issue of "sexual release" language and Petitioner provides no sufficient reason why his failure to exhaust should be excused pursuant to § 2254(b)(1)(B).  Consequently, it is recommended that Petitioner's requested relief on this claim be denied.  It is recommended summary judgment be entered for Respondent.

### 11.    *Prosecutor's statements regarding credibility*

Petitioner next alleges his trial counsel was deficient for failing to object when the prosecutor, during closing arguments, stated, "The only one who is claiming that the defendant's mother walked in and out of the bedroom is the defendant and the defendant's mother, who we both know were lying yesterday in court.  They were. That's obvious.  They had every motive.  So don't take their word for anything.  I don't believe for one second that that mother was walking in and out of that bedroom.  I don't even believe the mother was in the living room."  (D.E. 5-27, Page 54).

Petitioner alleges the prosecutor improperly argued a personal opinion as to his and his mother's credibility.  (D.E. 13, Pages 77-78).  Although Petitioner properly

presented this argument, the state court did not adjudicate the claim on its merits. As such, Petitioner asserts this Court should review his argument *de novo*.[24]

Regardless of whether this issue is reviewed *de novo* or under the AEDPA requirements, the result is the same.   Even though the prosecutor's argument was improper, "the burden is on the habeas petitioner to also show a reasonable probability 'that but for these remarks' the result would have been different." *Ellis v. Quarterman*, 308 Fed. App'x 769, 771 (5th Cir. 2009)(citation omitted).   "Improper remarks by a prosecutor 'are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair.'" *Burkett v. Thaler*, 379 Fed. App'x 351, 357 (5th Cir. 2010)(*citing Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008).   "Such unfairness exists only if the prosecutor's remarks evince either persistent or pronounced misconduct or…the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred."   *Id*.   "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."   *Id.* (*citing Hughes*, 530 F.3d at 347)(citation omitted)).   Further, the court should consider whether Petitioner "can demonstrate a reasonable probability that if counsel had requested a curative instruction and, if such an instruction had been given, it might have affected the jury's decision." *Id*. at 360.

---

[24]The trial court issued a decision on this matter, finding the prosecutor's argument that "[Petitioner] and his mother were lying…" was "improper" but  "Perkins' failure to object to this argument did not fall below the objective standard of reasonableness under the prevailing professional norms" and "any deficient performance in failing to object did not cause prejudice, and specifically that there is not a probability sufficient to undermine confidence in the outcome that, but for the failure to object, the result of the proceeding would have been different."   (D.E. 6-11, Pages 1-2).

The state presented substantial evidence against Petitioner, including, but not limited to, the testimony of several police officers, A.G.'s mother, A.G., and sexual assault treatment professionals. Further, Petitioner and his mother testified. These witnesses were subject to cross examination as to any inconsistencies and the jury was able to assess their credibility. *Id.* at 357. Further, as previously discussed in this M & R, Petitioner signed a voluntary statement admitting to certain illegal actions and this statement was properly admitted into evidence. Additionally, the trial court instructed the jury that "[t]he jury is the exclusive judge of the facts proved of the credibility of the witnesses and of the weight to be given their testimony." (D.E. 5-27, Page 27). Therefore, the undersigned "presume[s] that the jury followed the court's instructions and gave the prosecutor's arguments the appropriate weight." *Id.* (citation omitted).

Whether reviewed *de novo* or under AEDPA, Petitioner has failed to show counsel's performance prejudiced his defense. *See Strickland*, 466 U.S. at 694; *See also Harrington*, 562 U.S. at 789. The evidence is this case "was substantial and the prosecutor's improper arguments relatively brief." *Burkett*, 379 Fed. App'x at 360. Further, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.

Petitioner also alleges his trial counsel was deficient for failing to object when the prosecutor stated, again during closing arguments, "As I told y'all during voir dire, I used to be a defense attorney. I've tried cases from the other side. And I can tell you that a standard tactic of defense attorneys, when your victim has done something indefensible,

put the victim on trial instead and that's just what Mr. Cueva has tried to do.  He wants you to believe there's a grand conspiracy here.  It involves this little girl, the police, the S.A.N.E. nurse, the little girl's mother.  They all conspired to jack him up, unfairly, unjustly.  Do you really believe that?  Do you really believe there's a grand conspiracy?" (D.E. 5-27, Pages 59-60).  Petitioner alleges the prosecutor's argument that the defense put the victim on trial was beyond the scope of permissible areas of closing and was so inflammatory that no instruction to disregard could cure it.  (D.E. 13, Page 81).

The state court found it was permissible as the "prosecutor's argument, aside from the irrelevant and inconsequential fact that the prosecutor used to be a defense attorney, did not inject any new facts or speculation into the argument that were not already before the jury."  (D.E. 5-6, Page 23).  Rather, the state court found, when viewed in context, this "argument was a summary of the defense that [Petitioner] presented, and it attacked the defense tactic and not the defense attorney himself.  Moreover, whether [Petitioner]'s trial counsel labeled it a 'conspiracy' defense or not, [Petitioner]'s own testimony and the arguments made by his counsel advanced the defensive theory that A.G.'s mother was attempting to get rid of [Petitioner] so that A.G.'s mother could then return to, and be accepted by, her own family."  (D.E. 5-6, Page 24).  The state court concluded that under the prevailing law, "the prosecutor, in this case, was entitled to attack this theory as an attempt to shift the blame to A.G."  (D.E. 5-6, Page 24).

The state court determined this testimony was permissible under state law, and as such, this Court may not conclude otherwise.  *Charles*, 629 F.3d at 500 (federal court

lacks authority to rule that a state court incorrectly interpreted its own law).[25]   Therefore,

it is recommended relief on this claim be denied as the state court found this testimony

was admissible and trial counsel is not deficient in failing to raise groundless objections.

*Clark*, 19 F.3d at 966.   Further, Petitioner failed to show that the state court's

determination was contrary to, or involved an unreasonable application of, *Strickland* or

was an unreasonable determination of the facts based on the evidence in the record.

Therefore, it is recommended summary judgment be entered for Respondent on this

issue.

### C.    Punishment Phase

As stated throughout this M & R, to prevail on an ineffective assistance of counsel

claim petitioner must show counsel's performance fell below an objective standard of

reasonableness and that deficient performance prejudiced the defense.   *Strickland*, 466

U.S. 668 (1984).   To show *Strickland* prejudice at the punishment phase, a habeas

petitioner must establish there is a reasonable probability that, absent counsel's errors, the

sentence imposed would have been "significantly less harsh."   *Spriggs*, 993 F.2d at 88-

---

[25]Petitioner asserts *Charles* should not apply because the state court ignored the trial court's conclusion that this argument was improper and an objection would have been sustained. However, Petitioner cites to no case law in support of this argument and the trial court's conclusion does not change the higher state court's conclusion that this evidence was admissible. Further, while the trial court found the prosecutor's argument was improper, it also found there was no resulting prejudice from trial counsel's failure to object.   (D.E. 6-11, Page 2). Additionally, for the same reasons as discussed regarding Petitioner's objections to the other statement in the prosecutor's closing, Petitioner has failed to show prejudice given the amount of evidence at trial.

89; *see also Miller v. Dretke*, 420 F.3d 356, 365 (5th Cir. 2005).[26]   Among the relevant

factors the court must consider are: "the actual amount of the sentence imposed on the

defendant by the sentencing judge or jury, the minimum and maximum sentences

possible under the relevant statute or sentencing guidelines, the relative placement of the

sentence actually imposed within that range, and the various relevant and mitigating and

aggravating factors that were properly considered by the sentence."   *Miller*, 420 F.3d at

365(*quoting Spriggs*, 993 F.2d at 88).

> 1.     *Testimony and argument regarding a change in state's minimum sentence*

Petitioner alleges his trial counsel was ineffective for failing to object to testimony

from probation officer Kimberly Escamilla as well as the prosecutor's closing argument

about the change in the law shortly after Petitioner's offenses increasing the minimum

sentence for aggravated assault of a child younger than six years of age from five years to

25 years and prohibiting a probated sentence.  (D.E. 13, Pages 89-94).[27]

Mr. Perkins questioned Ms. Escamilla about the conditions placed on a person

who is on probation for aggravated sexual assault.  (D.E. 6-1, Pages 24-26).  On cross

examination, the prosecutor elicited testimony from Ms. Escamilla about the change in

the law, specifically that the crimes at issue were committed shortly before the minimum

---

[26]While Petitioner disputes the correctness of applying *Spriggs*, he acknowledges it is controlling law in the Fifth Circuit.  (D.E. 13, Pages 72-74).

[27]It is undisputed that these amendments were made effective on September 1, 2007, after the offenses at issue in this case.  (D.E. 13, Page 91); Acts of June 15, 2007, 80th Leg., R.S., ch. 593, §§ 1.06, 1.18, and 1.19, 2007 Tex. Gen. Laws (current version at Tex. Penal Code § 22.021 and Tex. Crim. Proc. Code Art. 42.12).

sentence was increased and more restrictive conditions were enacted.[28]  (D.E. 6-1, Pages

27-28).  Further, during closing arguments, the prosecutor reiterated the change in the law

when arguing to the jury that Petitioner should receive a life sentence.[29]  (D.E. 6-1, Pages

49 and 51).

---

[28]The prosecutor asked Ms. Escamilla a series of questions, to which she replied "Yes" to all, including:  "You were asked about the law and about different things.  Are you aware that the law changed in September of 2007 regarding sex offenders?; And after September 2007, if an offense was committed after September 2007 that a sex offender convicted of aggravated sexual assault of a child is not eligible for probation from a jury.  Are you aware of that?; So you would agree with me that [Petitioner] has benefited because he committed his aggravated sexual assault in August 2007, so he has benefitted by the law change since it is before this—let me rephrase that.  Would you agree that the defendant has benefited because he committed his offense before the law change?; If the defendant had committed this offense against [A.G.], for example, in September of 2007, he would not be able to even ask for probation from a jury?; Are you also aware that the law changed in September 2007 regarding children under six that are sexually assaulted; That for a defendant that commits aggravated sexual assault of child who is under the age of six is now a minimum of 25 years in prison?; Would you agree with me that [Petitioner] has benefited because he committed this crime before that law went into effect?"  (D.E. 6-2, Pages 27-28).

[29]The prosecutor argued, "You need to do the right thing for [A.G.], and the right thing in this case is to send him away for life in prison.  Why life in prison?  Because the minimum for one count of aggravated [assault] of a child is now 25 years in prison.  For just one count of what he did if he would have committed it one month later, it would be automatically minimum 25 years.  He has benefited by committing this crime prior by one month to the new law going into effect.  Why did the legislature change this and decide that someone who would rape a six year old child should no longer receive probation and should get as a minimum, 25 years?  Because pedophiles are dangerous.  They need to be removed and locked away.  Sometimes the law takes a long time to catch up with society deems necessary.  A great example of that, 30 years ago it was not a crime to drive drunk and kill someone.  Now it is a second degree, two to 20 years in prison for getting in a vehicle drunk and killing someone.  Finally, the law has caught up to pedophiles."  (D.E. 6-1, Page 49).

Probation.  What would be a probation case?  A 13 and a half year old girl who was in a boyfriend/girlfriend situation with an 18 year old.  This is very different.  I know I spent a long time going over probation and I know it was boring and I am sorry…I know it was boring, but I wanted  you so much to see that probation is not anything.  If it was so difficult, he would not be begging for it…This is not  a probation case and I remind you again that the legislature even said that.  We are asking for full justice in this case.  (D.E. 6-1, Page 51).

Petitioner asserts this testimony about legislative amendments was irrelevant and improper, citing to one case where counsel was found ineffective for failing to object to a prosecutor's argument misstating applicable law.  (D.E. 13, Pages 91-92); *Ex Parte Drinkert*, 821 S.W.2d 953,955 (Tex. Crim. App. 1991).  Petitioner asserts this evidence "certainly destroyed any chance [he] had of obtaining probation or a prison sentence less than 25 years" because "it set the floor of the punishment deliberations at 25 years instead of five years."  (D.E. 13, Page 117).

The state court found the testimony and arguments were admissible as relevant as they assisted the factfinder in deciding what sentence was appropriate.  (D.E. 5-6, Pages 25-28).  Noting that Petitioner provided "no authority that suggests this evidence is so clearly irrelevant and improper that trial counsel may be held ineffective for failing to object to its admission" and "[w]here there is no statute or case law that suggests this evidence is inadmissible, the law is unsettled, and we cannot conclude that trial was ineffective for failing to object at trial."  (D.E. 5-6, Page 28).  Further, the state court concluded that under the prevailing law "proper jury argument includes, among other things, a plea for law enforcement and a summation of the evidence at trial" and "it would have been reasonable for counsel to interpret the summation as a plea for law enforcement or as a summation of the evidence."  (D.E. 5-6, Page 28).

The state court determined this testimony and argument was permissible under state law, and as such, this Court may not conclude otherwise.  *Charles*, 629 F.3d at 500 (federal court lacks authority to rule that a state court incorrectly interpreted its own

law).[30]   Therefore, it is recommended relief on this claim be denied as the state court found this testimony was admissible and trial counsel is not deficient in failing to raise groundless objections. *Clark*, 19 F.3d at 966.   Further, Petitioner failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.   Therefore, it is recommended summary judgment be entered for Respondent on this issue.

    2.    *Testimony and argument regarding life sentence and another trial*

Petitioner next alleges his counsel was ineffective for failing to object to testimony from A.G.'s grandmother[31] and great-grandmother[32] that he receive a maximum life

---

[30]Petitioner asserts *Charles* should not apply because the state court ignored the trial court's conclusion that this argument was improper and an objection would have arguably been sustained.  However, Petitioner cites to no case law in support of this argument and the trial court's conclusion does not change the higher state court's conclusion that this evidence was admissible.  Further, while the trial court found the prosecutor's argument was improper, it also found there was no resulting prejudice from trial counsel's failure to object.  (D.E. 6-11, Page 4).

Additionally, even if this Court were to consider this issue further, this testimony and argument is clearly distinguishable from the one case cited by Petitioner as the prosecutor did not misstate the law and in fact, made it very clear that the changes did not apply to Petitioner as his crimes occurred prior to it going into effect.  (D.E. 6-1, Pages 49-51 and D.E. 6-2, Pages 27-28).  Further, the prosecutor repeatedly argued against probation and against a short sentence making it clear to the jury that the new minimum sentence and restrictions did not apply to Petitioner.  (D.E. 6-1, Pages 49-50).  In short, there was no misstatement of the law.

[31]During cross examination by Petitioner's trial counsel, A.G.'s grandmother testified that she called the prosecutor to check on how the case and trial were progressing "[b]ecause [she] thought it was taking too long."  (D.E. 6-1, Page 13).  Mr. Perkins then asked, "You wanted [the prosecutor] to make sure this case went to trial.  Why?" to which she replied, "Because I want him to pay for what he did to my granddaughter."  Mr. Perkins then asked, "What do you want him to pay?  How do you want him to pay for what he did?  Tell the jury." to which she replied, "I want him to go to the rest of his life to jail for what he did to my granddaughter because he has endured a lot of pain and suffering on her for the rest of her life.  So I want him to go to jail for the rest of his life.  That is not fair."  Mr. Perkins then asked, "That's the justice you want in this

sentence and for failing to object when the prosecutor emphasized this testimony, along with an argument to assess a life sentence to avoid another lengthy trial, in her summation.  Petitioner also alleges his trial counsel as ineffective for failing to object to the prosecutor's argument that A.G. and law enforcement wanted Petitioner to receive a life sentence.[33]  (D.E. 13, Pages 94-97 and 108-112).

The Texas Court of Criminal Appeals has found that it "strongly discourage[s] the State from soliciting or making any references to the wishes of the victim's family or friends about the punishment to which the defendant should be sentenced" as these wishes "fall beyond the parameters of victim-impact evidence and are not admissible." *Simpson v. State*, 119 S.W.3d 262, 272-74 (Tex. Crim. App. 2003)(citation

---

case?" to which she replied, "Yes, sir."  Mr. Perkins then asked, "And you began bothering or pushing the prosecutor to make sure--" to which she stated, "I never bothered."  After an objection from the prosecutor was overruled, Mr. Perkins concluded this line of questioning by asking, "You are not going to be happy unless he spends the rest of his life in prison?" to which she replied, "Yes, sir."  (D.E. 6-1, Page 13).

[32]When asked by the prosecutor, "What would be justice in this case?" A.G.'s great grandmother replied, "The maximum penalty." (D.E. 6-1, Page 14).

[33]The prosecutor stated, "I find it interesting that the defense is arguing that [A.G.] does not want him to go to prison.  That's not true.  [A.G.] wants him in prison for the rest of his life.  So does her family.  The detective—the detectives in this community is [sic] asking for a life sentence. This defendant lied to each of you.  He lied to every one of you.  Don't let him get away with this.  He has damaged all of [A.G.]'s family.  [A.G.] has been hurt.  His own son has been hurt. [A.G.]'s mother and grandmother are going to live with this the rest of their lives.  How do you think it feels for [A.G.]'s grandmother and great grandmother to think about a future son-in-law who did something so monstrous."  (D.E. 6-1, Page 50).  The prosecutor further argued:

The police did the right thing.  Detective Gonzalez did the right thing.  He affirmed her.  The sexual assault nurse did the right thing and affirmed her.  Now it is your turn to affirm [A.G.]. What would be affirmation here for this horrible brutal crime is 99 years in prison.  At least give her the comfort of knowing that he will never ever get out of prison.  By giving him a high sentence, the victim will not have to go through another trial in Mission, Texas.  This will be it. This is called the punishment phase of the trial.  Let the punishment fit the crime.  (D.E. 6-1, Page 50).

omitted)(finding no abuse of discretion in denying motion for mistrial given the weight of the evidence and that "[j]urors understand that the victim's family members will be emotional and therefore less objective about what punishment should be given.")

Petitioner's trial counsel was asked at the motion for new trial hearing, "Explain what points you were hoping to gain with the jury by demonstrating that grandma disapproved of her daughter's relationship with [Petitioner] at the punishment stage to which he replied, "The whole point at punishment was to try to get the jury as sympathetic to [Petitioner] as possible in hopes of them giving him probation."  (D.E. 6-3, Page 14).  Mr. Perkins was later asked, "Isn't it true that you elicited from grandma testimony that she wanted [Petitioner] to spend the rest of his life in jail for what he had done to [A.G.]" to which he replied, "Yes."  He was then asked, "You agree with me that—let me ask this.  Are you familiar with the body of case law that says a witness may not testify to his or her opinion at the punishment stage as to what the sentence should be?"  Mr. Perkins answered that this testimony "probably would have been inadmissible" had he objected to it but his strategy for eliciting this testimony was to show how "[h]er demeanor and her behavior was clearly hostile.  Unfortunately, the record is a little bit sterile as far as a person's behaviors and mannerisms and things like that in the course of a trial.  That strategy was it was [sic] to demonstrate how unreasonable she was.  How emotional she was about it and it was designed, whether that design was effective or not, to show the jury that the grandmother had a far different stake in this than mere justice." (D.E. 6-3, Page 15).

The state court found, "Other testimony at the punishment phase brought out that A.G.'s family did not like or approve of [Petitioner] even before the incidents occurred. During his argument, [Petitioner]'s counsel then suggested that these witnesses were not seeking justice, but vengeance, in contrast to A.G. herself, who counsel claimed 'did not come up here and tell you to throw [Petitioner] away for the rest of his life. Because the child can see the good, the redeemable in us.' The record supports a conclusion that it was sound trial strategy to show the bias of the prosecution witnesses in order to demonstrate that their requested punishment was unreasonable and in sharp contrast to what the defense believed would be a just outcome—that being to place [Petitioner] on probation." (D.E. 5-6, Page 29). The state court concluded, citing *Strickland*, that "[c]ounsel made strategic decisions regarding this testimony, and decisions based in strategy do not constitute deficient performance." (D.E. 5-6, Page 29); 466 U.S. at 689. Petitioner argues it is well settled that this testimony was inadmissible and trial counsel's strategy was unsound. (D.E. 13, Pages 95-96).

Petitioner further objects to the prosecutor's argument asserting there was no evidence that A.G. or any police officers wanted a particular punishment and there was no evidence that Petitioner had a pending charge in Mission, Texas, or that there would be another trial there depending on the outcome of the trial at issue. (D.E. 13, Pages 108-109).

Mr. Perkins testified at the hearing for a new trial that neither A.G. or any police officers testified as to what sentence they thought should be assessed. (D.E. 6-3, Page 22). He further testified that while this argument "obviously did not help" his client, he

did not interpret it as outside the scope of the presented evidence because "[t]o me that was more of the general prosecutor's plea for law enforcement and she was speaking on behalf of the community, not so much – I didn't hear that argument as being a re-elicitation or restatement of testimony.  That's why I did not object."  He also testified, "At the time, I believed it could have been interpreted as a proper plea for law enforcement."  (D.E. 6-3, Page 22).

The state court found, after reviewing the cases cited again by Petitioner, "Based on our review of the record, including the prosecutor's entire closing argument, it would have been reasonable for counsel to interpret the prosecutor's argument as a plea for law enforcement rather than the summary of the testimony of a witness.  Moreover, even were we to agree with [Petitioner]'s interpretation that the prosecutor was arguing that everyone wanted [Petitioner] in prison for life, this is consistent with [Petitioner]'s trial strategy to show that the prosecution witnesses were biased against him, a strategic reason for not objecting.  And to the extent we would conclude that counsel's failure to object was improper, we would further conclude that it did not fall below an objective standard of reasonableness under the prevailing professional norms."  (D.E. 5-6, Pages 39-40)(citations omitted).  Further, the state court held that, "As for the prosecutor's argument that A.G. would have to endure another trial in Mission, Texas, if the jury did not assess a long sentence, counsel may well have decided not to object in order to avoid highlighting such an argument or encouraging the jury to dwell on the possibility of another trial.  He may also have decided that the jury's speculation that, whatever sentenced they imposed, [Petitioner] might still be subject to prosecution and punishment

in a separate case, which would work in his favor." (D.E. 5-6, Page 40). The state court concluded that "counsel made strategic decisions regarding the prosecutor's argument" and "we cannot conclude that counsel's conduct, in this regard, was so outrageous that no competent counsel would have engaged in it." (D.E. 5-6, Pages 40-41)(citations omitted).

The state court's application of the *Strickland* standard was not unreasonable. *Harrington*, 562 U.S. at 101. As to the testimony presented, it was Petitioner's trial counsel who elicited testimony from A.G.'s family as part of his trial strategy to show unreasonable bias. As a result, the question under AEDPA becomes whether there was an objectively reasonable rationale that would explain why trial counsel sought this testimony. Given that judicial scrutiny of counsel's performance must be highly deferential, when viewing Mr. Perkins' challenged strategy at the punishment phase, the undersigned does not find this strategy was outside "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 689 (citations omitted). Additionally, testimony was also admitted from Petitioner's father that Petitioner would follow the rules of probation, that he did not want to see his son spend his life in prison, and that it would benefit Petitioner to receive help, rather than prison time, to overcome abuse he sustained as a child. (D.E. 6-1, Pages 44-45). As to trial counsel's failure to object to the prosecutor's passing reference to the victim's family member's wishes during closing, it would have undermined his stated strategy to first seek this testimony and then later object to its reference.

Further, as to the remainder of the disputed argument, Petitioner has failed to demonstrate his trial counsel's stated strategy or the state court's holding was deficient or

unreasonable. The critical issue in the first prong of *Strickland* is the objective reasonableness of trial counsel's conduct under then-existing circumstances. Even though Mr. Perkins' strategy was ultimately not successful in the jury rendering a probated sentence, the undersigned does not find it amounted to incompetence under "prevailing professional norms." *Id*. at 690.

Additionally, even if Petitioner could show that his trial counsel's performance was deficient, he fails to satisfy the second prong of the *Strickland* test, as it cannot be concluded Petitioner suffered prejudice because there is not a reasonable probability Petitioner would have received a "significantly less harsh sentence." *Spriggs*, 993 F.2d at 88-89.

Petitioner has failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Therefore, it is recommended summary judgment be entered for Respondent on these issues.

### 3.  *Testimony and argument about rehabilitation*

Petitioner next alleges his trial counsel was ineffective for failing to object to testimony from Ms. Escamilla, a probation officer, that sex offenders cannot be rehabilitated because it was not established she was qualified, as an expert, to make this conclusion.[34] Petitioner further alleges his trial counsel was deficient for failing to object

---

[34]Ms. Escamilla was asked by the prosecutor, "Are you aware that sex offenders cannot be rehabilitated?" to which she replied, "Yes." (D.E. 6-1, Page 28). She was then asked, "So you agreed with me that they cannot be rehabilitated, to which she replied, "Correct." She was then asked, "That as a result the most that probation [officer] who is stuck with a defendant that is a

to the prosecutor's closing argument emphasizing this testimony.[35] (D.E. 13, Pages 97-101).

Mr. Perkins testified at the motion for new trial hearing that he called Ms. Escamilla as a witness to testify about the conditions of sex offender probation and he did not call her to give expert testimony on the psychology of sex offender treatment. (D.E. 6-3, Page 17). Mr. Perkins further testified that while she had not been qualified as an expert, he did not know if she was unqualified to give that testimony and he did not object because "[t]here is a strategic benefit to objecting or not objecting at important points to the trial. In order to preserve clearly important issues on appeal, objections are absolutely necessary. It is not my practice to object constantly during the course of a trial simply to make sure questionable issues are preserved on appeal. That particular issue

---

[35]sex offender, the most they can do is try to get them to change their behavior but understanding that they can't ever be rehabilitated?" to which she replied, "Correct." Elaborating on this testimony, Ms. Escamilla then stated, "What happens is once the person is placed on probation they meet with their officer. They do an in-take, go over what is expected of them, all conditions imposed upon them. Then they will begin their sex offender therapy and during that therapy, they are forced, I guess, to deal with the actions or consequences of their actions admitting their responsibility. Once they do that, we will then communicate with the therapist or the agency that they are going to sex offender therapy as far as his progress, how well he is doing with therapy." (D.E. 6-1, Page 28).

[35]The prosecutor argued, "Why are pedophiles so dangerous? Why are they worse than people that murder or steal or rob? Because they come across as such good guys. They come across as being so nice. They are church going. They have family. They have children. They come across like your best friend or like your favorite uncle. They are able to hide the secret crime. They don't ever change. They are not ever rehabilitated. He is young. He is smooth and he is on the prowl for the next woman with a child. And we know he is opportunistic. He is going to select another woman who has a young daughter, and believe me, if you let him out of prison or if you give him probation, he will have excuse after excuse for how he got convicted of this and he will be convincing." (D.E. 6-1, Page 49).

did not strike me as being so eminently objectionable to that I needed to object to that at that point."  (D.E. 6-3, Page 17).

The state court, thoroughly reviewing Ms. Escamilla's entire testimony regarding this issue in context, determined Mr. Perkins was not ineffective for failing to object to the admission of the disputed testimony.  The state court found that "[d]efense counsel is not required to challenge the qualifications of every expert who testifies at trial," and as "[t]he record is silent regarding whether the State could easily have proven Officer Escamilla's qualifications if they had been challenged," "we cannot conclude that trial counsel's performance was deficient when he did not object that the State did not establish Officer Escamilla's qualifications."  (D.E. 5-6, Pages 31-32)(citation omitted). The state court further distinguished *DeLeon v. State*, the case cited again by Petitioner in his current brief, finding that the *DeLeon* Court affirmed DeLeon's conviction but found his counsel was ineffective during the punishment stage not because he failed to object to the probation officer's qualification to render an opinion but because he failed to object to the "highly inflammatory nature of the officer's testimony as a whole."  (D.E. 5-6, Pages 32-34); 322 S.W.3d 375, 378, 384-87 (Tex. App. –Houston [14th Dis.] 2010, pet. ref'd). Finding Ms. Escamilla's testimony fell "far short of the testimony condemned by the *DeLeon* Court," the state court found "while she agreed that sex offenders cannot be rehabilitated, she also agreed that one can try to get a sex offender to change his behavior, which would support a conclusion that the risk may be minimized or lessoned."  (D.E. 5-6, Page 34).   Further, the state court noted that "by allowing the State's line of questioning, counsel was later able to ask Officer Escamilla [after the prosecutor's

unsuccessful objection] whether [Petitioner]'s admission to some of the charges indicated that he was likely a good candidate for probation."[36]  (D.E. 5-6, Pages 34-35).  Therefore, the state court found that, unlike *DeLeon*, Petitioner "had not shown in the record that counsel's conduct was not the product of a strategic decision."  (D.E. 5-6, Page 35).  The undersigned agrees.

When viewing the testimony in context and Mr. Perkins' testimony regarding his defense strategy and his additional questioning, Petitioner has not shown counsel's performance fell below an objective standard of reasonableness or that even if it did, that deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 694; *See also Harrington*, 562 U.S. at 789.  While Petitioner argues the state court failed to extend its analysis to the prosecutor's arguments on this issue, the undersigned recommends his argument is without merit.  The state court found Mr. Perkins was not ineffective for failing to object to Ms. Escamilla's testimony.  Therefore, as noted several times in Petitioner's current brief, the prosecutor was entitled to summarize the evidence during closing.

Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable

---

[36]After having her reviewing Petitioner's written confession where Petitioner requested "help for what I have done to A.G." Mr. Perkins asked Ms. Escamilla, "If a person's desire to - if not cure but- certainly work on his problem is that desire a big part of whether or not he will be a successful candidate on probation?" to which she replied, "Yes."  (D.E. 6-1, Pages 29-30).  Ms. Escamilla also testified that, "Well, if he did confess to some of the offenses then I would say, yes, that he is, I guess, seeking treatment."  (D.E. 6-1, Page 30)

determination of the facts based on the evidence in the record. Therefore, it is recommended summary judgment be entered for Respondent on this issue.

### 4. Extraneous Offense Evidence

Petitioner next alleges his trial counsel was ineffective for eliciting, opening the door to, or failing to object to extraneous offense evidence, specifically that Petitioner had previously been arrested for assaulting A.G.'s mother and had also been previously arrested twice for driving while intoxicated.[37] (D.E. 13, Pages 102-106). Petitioner

---

[37]Mr. Perkins asked A.G.'s grandmother, "Did you disapprove of [A.G.'s mother]'s relationship with [Petitioner]? to which she replied, "Yes, I did." (D.E. 6-1, Page 11). He then asked, "Why?" to which she replied, "Okay. I don't know exactly what day especially after that date where he got arrested for assault of my daughter. Any parent would disapprove of that." Mr. Perkins then asked, "Were you around? Do you know anything about the circumstances?" to which she replied, "Yes. I was around when he came back trying to get into the apartment that he had left destructively. And I was there when he got arrested." He then elicited testimony that she had called the police because she "knew he'd come back and he did, trying to break the door down to get to my daughter." (D.E. 6-1, Page 11).

A.G.'s great-aunt was asked a series of questions by the prosecutor about an incident between Petitioner and A.G.'s mother in Mission, Texas, describing how their apartment was in disarray and Petitioner was not there because the "policeman had already taken him." (D.E. 6-1, Pages 17-18). She then testified that Petitioner and A.G.'s mother lived in the same house after this incident with A.G.. (D.E. 6-1, Page 18).

Petitioner's best friend testified as a character witness, detailing how Petitioner helped him with his children, taught him to be a better father, and how overall, Petitioner was a great person and a responsible person. (D.E. 6-1, Pages 42-43). On cross-examination, the prosecutor asked, "Is it being a good father to sexually assault or rape a five year old girl?" to which he replied, "No." He was then asked, "Is it being a good father or responsible person to get arrested for DWI twice in a year?" to which he replied, "No, it is not." He was then asked, "Would you agree with me that somebody who is doing those kinds of things is not a good father?" to which he replied, I agree they need help." (D.E. 6-1, Page 44).

Petitioner's father also testified as a character witness. Mr. Perkins asked him if Petitioner was the kind of person who could follow the rules and conditions of probation, to which Petitioner replied, "He is a good man. I'm very, very proud of him. I really don't believe this is happening but you should not have any problems with him. It's been a long, long five, six days for everyone. There is [sic] no problems with him. He is a great man, good man." Mr. Perkins then

argues these incidents were inadmissible because A.G.'s mother "did not testify that petitioner assaulted her, and there was no evidence that petitioner had been arrested or convicted of driving while intoxicated" and as such, "the State could not offer inadmissible hearsay testimony and ask improper questions to prove that he committed these extraneous offenses."  (D.E. 13, Pages 102-103).

The state court first correctly noted that unadjudicated extraneous offense evidence is admissible during punishment in certain instances. (D.E. 5-6, Page 35)(citations omitted).  The state court found the "record supports a conclusion that it was a sound trial strategy to show the grandmother's and great-aunt's dislikes for, and biases against, [Petitioner] to demonstrate their requested punishment was unreasonable. Counsel also took a strategic risk in asking about the kind of person [Petitioner] was, perhaps seeking sympathy for [Petitioner].  By doing so, counsel had no basis to object to the State's impeachment of those witnesses with prior bad conduct.  Thus, we conclude counsel made strategic decisions regarding this testimony."  (D.E. 5-6, Page 36).  The state court further noted "that the punishment charge contained a paragraph instructing the jury not to consider testimony concerning extraneous offenses if it was not proved

---

asked him "What the prosecutor is going to come back and say, Mr. Cueva, is how can you say that about somebody who has been convicted of these very very heinous crimes?" to which he replied, "Convicted and doing – well, I believe my son.  I believe what he said.  I believe he would not do anything wrong." (D.E. 6-1, Page 44).  On cross-examination, the prosecutor, after asking him in detail if Petitioner told him about any of the details in his confession, asked, "Okay.  Did you know about his DWI arrests?" to which he replied, "Yes."  He was then asked, "Did you know about his arrests for beating [A.G.'s mother]?" to which he replied, "No, sir." (D.E. 6-1, Page 46).

beyond a reasonable doubt.  Therefore, counsel's performance was not ineffective for this reason." (D.E. 5-6, Page 37).

Texas law expressly allows the use of extraneous offense evidence during punishment, as long as it is relevant to sentencing, regardless of whether the defendant has been charged with or convicted of the crime or act. *See Sandifer v. Stephens*, No. H-14-0688, 2015 WL 4208200, at 10 (S.D. TX. July 2, 2015)(*citing* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a) and *Huizar v. State*, 12 S.W.3d 479, 483 (Tex. Crim. App. 2000)). The fact-finder must be satisfied beyond a reasonable doubt that such act and offenses are attributable to the defendant.  *Huizar*, 12 S.W.3d at 483(a jury instruction is required if the jury is to consider extraneous offense and bad act evidence under the statutorily prescribed reasonable doubt standard); *see also Batiste v. Quarterman*. 622 F.Supp.2d 423, 435-36 (S.D. Tex. 2008).

Petitioner has failed to show the complained-of testimony was not relevant to the punishment phase of his trial.  Further, as noted by the state court, the trial court properly instructed the jury as to the appropriate standard after the admission of this testimony. Additionally, when viewing the testimony in context, Petitioner's trial counsel was executing a trial strategy to establish that Petitioner would be capable of following probation conditions, regardless of A.G.'s family's testimony to the contrary.  Given these circumstances, reasonable jurists could not debate or find wrong the conclusion that counsel's strategic decision is entitled to deference under the *Strickland* standard.

Additionally, even if Petitioner could show that his trial counsel's performance was deficient, he fails to satisfy the second prong of the *Strickland* test, as it cannot be

concluded Petitioner suffered prejudice because there is not a reasonable probability Petitioner would have received a "significantly less harsh sentence." *Spriggs*, 993 F.2d at 88-89.

Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record and it is recommended summary judgment be entered for Respondent on this issue.

5. *Prosecutor's argument that Petitioner attacked A.G. during trial*

Petitioner alleges his trial counsel was ineffective for failing to object to the prosecutor's argument that Petitioner victimized A.G. again during the trial "by attacking her."[38] (D.E. 13, Pages 106-108). Petitioner argues this argument was improper and a basis for a mistrial, citing *Villarreal v. State*, 860 S.W.2d 647, 650 (Tex. App.—Waco 1993); (D.E. 13, Page 106).

In *Villarreal*, the prosecutor argued to the jury during the punishment phase of the trial that Villarreal "made a conscious decision to rape a ten-year-old child. But he didn't do it just once. He forced her to have to come into this courtroom in front of a bunch of strangers." 860 S.W.2d at 649. The *Villarreal* Court, remanding the case for a new trial on punishment, found the comments "were not permissible" because the defendant "had

---

[38]The prosecutor stated during closing, "All we know is that he touched his penis on her anus and on her vaginal area, and even after he had done all of that, when he was caught in the act, he basically turned the tables on her and ended up during this trial victimizing her again by attacking her. This is a terrible crime." (D.E. 6-1, Page 49).

every right to invoke his Sixth Amendment right to jury trial" and "to confront the witnesses against him." *Id.*

The state court distinguished the prosecutor's argument in this case from the one in *Villareal*, finding the prosecutor "did not say that [Petitioner] victimized A.G. by making her go to trial and testify against him, as [Petitioner] asserts.   Rather, the prosecutor argued that [Petitioner] 'ended up during this trial victimizing [A.G.] again by attacking her.'  She did not explain or expand upon her statement.  Moreover, [Petitioner] concedes, on appeal, that the prosecutor was arguing that Petitioner attacked A.G.'s credibility. And [Petitioner], himself, testified that A.G. was lazy in the mornings, made excuses to get out of going to school, and got rashes because she did not know how to clean herself properly.  Such testimony could be seen as an embarrassing and demeaning attack on A.G."  (D.E. 5-6, Pages 37-38).  The state court, noting that Petitioner did not provide any record citations to support his characterization of the prosecutor's argument, found "there was nothing to which counsel should have objected."  (D.E. 5-6, Page 38).

The state court determined this argument was permissible under state law, and as such, this Court may not conclude otherwise.  *Charles*, 629 F.3d at 500 (federal court lacks authority to rule that a state court incorrectly interpreted its own law).[39]  Therefore,

---

[39]Petitioner asserts *Charles* should not apply because the state court ignored the trial court's conclusion that this argument was improper and an objection would have arguably been sustained.  However, Petitioner cites to no case law in support of this argument and the trial court's conclusion does not change the higher state court's conclusion that this evidence was admissible.  Further, while the trial court found the prosecutor's argument was improper, it also found there was no resulting prejudice from trial counsel's failure to object to this argument. (D.E. 6-11, Page 6).

it is recommended relief on this claim be denied as the state court found this argument was admissible and trial counsel is not deficient in failing to raise groundless objections. *Clark*, 19 F.3d at 966.   Further, Petitioner failed to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Therefore, it is recommended summary judgment be entered for Respondent on this issue.

### 6.     Counsel's argument it was not his job to seek justice

Petitioner next alleges his trial counsel was deficient for arguing during summation that it was not his job to seek justice. (D.E. 13, Pages 112-114).   Petitioner asserts this "argument was inconsistent with any reasoned punishment strategy."   (D.E. 13, Page 113).   He argues, "Any chance of convincing the jury-or even one juror-to assess probation or a lenient prison sentence was destroyed when he placed the prosecutor on a pedestal and diminished his role." (D.E. 13, Page 118).

Mr. Perkins argued, "I want you to think beyond just the argument the prosecution is going to make when they talk about justice.   In the Code of Criminal Procedure, the prosecutor's job is to see that justice is done.   That's not my job.   My job is to make the best plea for my client that I can possibly do.   That is what I am doing to you here today. Without shame, without embarrassment, of any kind whatsoever, I am here pleading for the life of my client, Charles Anthony Cueva." (D.E. 6-1, Page 48).

---

Additionally, even if this Court were to consider this issue further, the prosecutor's argument in this case is distinguishable from *Villarreal* for the reasons stated by the state court.

Petitioner's trial counsel testified at the motion for new trial hearing, "First of all, explaining exactly what the Code of Criminal Procedure says is the prosecutor needs to seek justice not that that job is different or better than the defense attorney's job but there is a specific definition for what the prosecutor is supposed to do.  Then I went on to say was my job is to plead my client's case to the jury as best as possible."  Mr. Perkins further testified that he did not interpret his argument as meaning it was not his job to see that justice was done.  (D.E. 6-3, Page 21).

The state court found, "In this closing argument, counsel referred to the prosecutor's job-one of seeking justice-and to his job-one of pleading for his client.  It is reasonable to conclude that counsel was explaining each counsel's respective function at trial, emphasizing that defense counsel does not have a generalized duty to seek justice, as does the prosecutor.  Rather defense counsel is to make the best case he can for his client, which would include arguing the evidence to support an acquittal or a light punishment.  It is also a reasonable strategy for the defense counsel to talk with the jury about his role in order to build credibility, to avoid the appearance that he is trying to mislead or behave unethically, and to be candid about his client's shortcomings.  Thus, we conclude counsel made strategic decisions regarding this argument."  (D.E. 5-6, Pages 41-42)(citations omitted).

In support of his argument, Petitioner cites to two cases where the Texas Court of Criminal Appeals found reversible error when prosecutors argued they took an oath to seek justice but defense counsel did not and when a prosecutor argued he was proud to be representing those paying his salary rather than being the mouthpiece for rapists, thieves,

and murderers.  (D.E. 13, Page 113); *Lewis v. State*, 529 S.W.2d 533, 534 (Tex. Crim. App. 1975); *Dykes v. State*, 325 S.W.2d 135, 136 (Tex. Crim. App. 1959).

Mr. Perkins' argument is clearly distinguishable when compared to those of the prosecutors in the cases cited by Petitioner.  Mr. Perkins, as noted by the state court, was explaining   each counsel's respective function at trial.  Reasonable jurists could not debate or find wrong the conclusion that counsel's strategic decision is entitled to deference under the *Strickland* standard.  Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record and it is recommended summary judgment be entered for Respondent on this issue.

### 7.   *Punishment Charge*

Petitioner asserts his trial counsel was ineffective for failing to object to a portion of the punishment charge which erroneously instructed the jury on how parole eligibility would be calculated.  (D.E. 13, Page 114-116).  Petitioner asserts the trial court should not have instructed the jury that any good conduct time earned would be added to the actual time served to determine when Petitioner would become eligible for parole.  (D.E. 13, Page 115).  Petitioner asserts his trial counsel's failure to object "allowed the jury to grossly miscalculate [his] parole eligibility to his detriment."  (D.E. 13, Page 118).

Mr. Perkins testified at the motion for new trial hearing that his failure to object was inadvertent and harmful and had he caught the error during the trial, he would have objected to it.  (D.E. 6-3, Page 11).  The state court, deferring to the trial court's holding, found that counsel inadvertently failed to object to this portion of the punishment charge

and this conduct was not deficient and, even if it was, the error, if any, regarding the application of good conduct time did not cause prejudice as the charge also instructed jurors not to consider how good conduct time and the parole law might be applied, neither party argued the concept of good conduct time or how it might be considered for parole eligibility, and the nature of the offenses warranted lengthy sentences. (D.E. 5-6, Page 15). The state court concluded counsel's actions regarding the alleged charge error were not deficient, and even if they were, it was not deficient. (D.E. 5-6, Page 16). The undersigned agrees. As found by the state court, even if there was a charge error, the trial court's additional instruction negated any prejudice.[40]

Therefore, Petitioner has failed to show the state court's determination was contrary to, or involved an unreasonable application of federal law, or was an unreasonable determination of the facts based on the evidence in the record and it is recommended summary judgment be entered for Respondent on this issue.

## V.    CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court nonetheless address whether he would be

---

[40]Specifically, the charge stated, "It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities. You may consider the existence of the parole law and good conduct time. However you are not to consider the extent to which good conduct time may be awarded to or forfeited by the particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant." (D.E. 6-9, Pages 28-29).

entitled to a certificate of appealability ("COA").  A District Court ruling on a petitioner's relief may *sua sponte* rule on a COA because it "is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious."  *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000)(per curiam).

A COA "may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  As to claims the Court rejects solely on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  As to claims the Court rejects solely on procedural grounds, the Petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

In Petitioner's case, reasonable jurists could not debate the dismissal or denial of the Petitioner's §2254 petition on substantive or procedural grounds, nor find that the issues are adequate to deserve encouragement to proceed.  *Miller-El*, 537 U.S. at 327. Accordingly, it is respectfully recommended the Court not issue a certificate of appealability.

## VI.     RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Respondent's Motion for Summary Judgment (D.E. 8) be **GRANTED** and Petitioner's application for habeas corpus relief be **DISMISSED**.   It is further recommended that a Certificate of Appealability be **DENIED**.

ORDERED this 19th day of February, 2016.

Jason B. Libby
United States Magistrate Judge

NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).